OPINION
{¶ 1} Defendant-appellant Jamie Patterson appeals his conviction and sentence entered by the Stark County Court of Common Pleas, on one count of gross sexual imposition, in violation of R.C. 2907.05(A)(4), following a jury trial. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On December 9, 2004, the Stark County Grand Jury indicted appellant on the aforementioned charge, a felony of the third degree. Appellant entered a plea of not guilty to the charge at his arraignment on January 14, 2005. The matter proceeded through discovery.
 {¶ 3} The trial court conducted a competency hearing of the victim, Caitlyn Patterson, appellant's daughter, on February 11, 2005. Caitlyn was 6 years old at the time of the hearing. At the hearing, the trial court advised counsel for both parties of the four criteria which it would use to measure Caitlyn's competency to testify. Specifically, those criteria were 1) Caitlyn's capacity for truthfulness; 2) her mental capacity; 3) her memory; and 4) her communication. In response to the trial court's inquiry, Caitlyn talked about her family, her home, and her school. Caitlyn advised the trial court she did not celebrate her birthday because her family was Jehovah's Witness. The trial court also asked Caitlyn about television characters such as Sponge Bob, Bob the Builder, Big Bird, and Barney. Caitlyn recognized these characters as imaginary.
 {¶ 4} The trial court additionally showed Caitlyn a picture of two boys looking at an animal, which Caitlyn said looked like a cat. The trial court told Caitlyn one boy said the animal was a cat, and the other boy said it was a puppy. Caitlyn correctly identified the boy who described the animal as a cat as telling the truth. The trial court repeated the process using a picture of two girls looking at food, which Caitlyn identified as pizza. Caitlyn informed the trial court a boy or girl who told a lie would get in trouble and it was a bad thing to tell a lie. When the trial court concluded its inquiry of Caitlyn, it allowed counsel from both parties to inquire of the child. Caitlyn admitted to appellant's trial counsel it was very important to do what her mother tells her, however, she stated she would tell the truth even if her mother told her to lie. At the conclusion of the hearing, the trial court found Caitlyn competent to testify.
 {¶ 5} The matter proceeded to jury trial on February 23, 2005. Gina Patterson, Caitlyn's mother and appellant's wife, testified she visited her sister for three or four hours on the evening of October 25, 2003, while appellant watched their three children. The following morning, when Gina woke her daughter, Caitlyn was crying uncontrollably and would not tell her mother the reason. Caitlyn eventually calmed down and went to school. Gina noted such behavior was unusual for Caitlyn. Later that evening as Gina gave Caitlyn a bath, the mother noticed the child's vaginal area looked unusually red and Caitlyn complained the area hurt. Gina asked Caitlyn is she had been touching herself, which the girl denied, and reminded Caitlyn to wipe herself correctly. Thereafter, Caitlyn disclosed, "Daddy did it." Gina asked Caitlyn to explain what had happened, and, after some reluctance, Caitlyn described how she had been sitting on appellant's lap and he touched her under her pants and inside her underwear.
 {¶ 6} At the time of the disclosure, appellant was at the hospital visiting his father who had had a stroke. A number of appellant's family members were staying at their home, and Gina decided to wait a few days until she confronted appellant. Appellant immediately stated Caitlyn was lying "like she lied before about the incident in the pool." Tr. at 306. Gina wanted to talk to appellant about the issue, however, appellant insisted he needed to return to the hospital. Because appellant would not discuss the situation further, Gina called Children's Services about making a report.
 {¶ 7} Gina recalled approximately five or six months prior to this incident, she was inside the house, cleaning, while appellant and Caitlyn were in the swimming pool in the backyard. As she went about her work, Gina occasionally looked outside. She noticed appellant and Caitlyn remained in the same position in the pool for a lengthy period of time. Appellant was sitting with his back toward the house and Caitlyn facing him with her arms below the water. Gina thought the situation was suspicious. When she opened the sliding door which led to the backyard, appellant immediately pushed Caitlyn away. Gina instructed Caitlyn to go into the house. Appellant remained in the pool. When Gina confronted Caitlyn about what she and appellant were doing in the pool, Caitlyn told her mother it was a secret. Gina described the girl as "giggly". Gina played along with her daughter and told the child she could tell her mother the secret. Caitlyn told her mother appellant let her touch his penis. Gina looked out the sliding glass door, and noticed appellant adjusting his swim shorts.
 {¶ 8} When appellant came inside, Gina immediately confronted him with Caitlyn's disclosure. Appellant became defensive, stating Caitlyn had pressed her hand on him and he had told her not to do that. Gina wanted to believe appellant, so she brought Caitlyn into the kitchen in order to discuss the situation. According to Gina, when she told Caitlyn what appellant said had happened, Caitlyn looked confused and did not seem to understand why appellant was saying she was not telling the truth. Appellant scolded Caitlyn for not telling the truth, but left Gina to handle the discipline. Gina discussed the importance of not lying and telling the truth with her daughter, and sent the girl to her room. Approximately 20 minutes later, Gina found Caitlyn in her room, crying. Caitlyn told her mother she should not have lied. Gina then had Caitlyn apologize to appellant.
 {¶ 9} Gina separated from appellant after the October, 2003 incident, and filed for divorce in February, 2004.
 {¶ 10} Detective Roy Tittle with the Special Investigative Unit of the Alliance Police Department testified he became involved in an investigation of appellant on October 31, 2003. Tittle explained he had received information from the Department of Job and Family Services regarding a report of sexual abuse of a child. Tittle interviewed appellant on November 3, 2003, at the Alliance Police Department. Tittle recalled appellant was nervous at the beginning of the interview, but became extremely nervous when the discussions centered around the actual allegations. Appellant admitted he had conducted an examination of Caitlyn's private area and "bumped her hole" with his right hand pinky finger.
 {¶ 11} Dr. Heather Guthrie, a therapist at Child and Adolescent Center, testified she performed a sexual abuse evaluation of Caitlyn in November, 2003. Dr. Guthrie stated the purpose of her assessment was to determine the affects of the allegations of sexual abuse, to ascertain a diagnosis, and to make appropriate recommendations. Dr. Guthrie testified the results of the child sexual behavioral inventory administered indicated Caitlyn was exhibiting more of the sexualized behaviors often exhibited by a child who had been sexually abused. Over the course of three sessions, Caitlyn told Dr. Guthrie appellant had inappropriately touched her in the vaginal area on several occasions. Dr. Guthrie concluded, based upon her training and experience as well as the child sex abuse evaluation she performed, Caitlyn's behavioral indicators and history were consistent with a child who had been sexually abused. Dr. Guthrie diagnosed Caitlyn with a mild form of post traumatic stress disorder, and recommended the child undergo counseling. The doctor further noted it was not uncommon for children of Caitlyn's age to put unpleasant or uncomfortable events behind them and move on with their lives.
 {¶ 12} Amy Anderson, a licensed professional clinical counselor, testified she became Caitlyn's counselor following Dr. Guthrie's referral. Anderson saw Caitlyn thirty-two times, with each session ranging from one half hour to an hour. During the course of the sessions, Anderson worked to gain Caitlyn's trust and the child eventually detailed the sexual abuse appellant perpetrated upon her.
 {¶ 13} Caitlyn testified she currently lives with mother, older brother, and younger sister. She explained appellant did not live with the family because he touched her in a bad place, "her private". Caitlyn recalled appellant had touched her with his pinky finger on more than one occasion, and, although her clothes were on, appellant "sticked his hand in my clothes." Tr. at 218. Caitlyn noted the incident occurred in the living room while she was sitting on appellant's lap.
 {¶ 14} Donna Abbott, a nurse practitioner in the Children At Risk Evaluation (CARE) Center of the Akron Children's Hospital testified she conducted an evaluation of Caitlyn on November 6, 2003, after receiving a report from the Stark County Department of Children's Services. Nurse Abbott obtained a history from Gina Patterson in order to assist her in conducting the physical examination. Nurse Abbott testified her physical examination of Caitlyn was essentially normal. Although the nurse noted no physical findings, Caitlyn's history and/or behavioral indicators were suspicious for sexual abuse. Nurse Abbott stated she could not make a diagnosis of sexual abuse based upon the limited amount of information she had received. She acknowledged only ten percent of child's sexual abuse cases reveal physical findings.
 {¶ 15} Appellant testified on his own behalf. He recalled, on a Monday evening at the end of October, 2003, Caitlyn came into the living room, jumped on his lap and began to watch TV with him. Noticing his daughter was squirmier than usual, appellant asked her what was wrong. According to appellant, Caitlyn pulled down her pants and told him she was sore. Appellant stated he visually looked for redness and proceeded to pull Caitlyn's buttocks apart to investigate further. Appellant explained Caitlyn "was sitting there . . . and climbed on my legs so I could kind of get a view, her leg slipped down into the sides of the chair. When that happened, naturally she came down on my hand." Tr. at 478-479.
 {¶ 16} On cross-examination, appellant stated he underwent an evaluation with Dr. Gerald Bello[1] at the request of the Stark County Department of Job and Family Services. Appellant acknowledged telling Dr. Bello he had spread Caitlyn's vagina and buttocks apart, and observed redness in both areas, and by doing this, he went too far. Appellant also stated he told Dr. Bello he used his finger to examine Caitlyn's inner vaginal lip and anus. Appellant acknowledged the matter was compounded further because Caitlyn slipped while she was sitting on his lap and he anally penetrated her anally with his finger. Appellant would not outwardly declare Caitlyn was lying, but stated her testimony was not accurate, confused, and "a little bit prodded". Tr. at 498.
 {¶ 17} After hearing all the evidence and deliberations, the jury found appellant guilty of one count of gross sexual imposition. The trial court sentenced appellant to a three year term of imprisonment and adjudicated him a sexual predator.
 {¶ 18} It is from this conviction and sentence appellant appeals raising the following assignments of error:
 {¶ 19} "I. THE TRIAL COURT ERRED BY IMPROPERLY ADMITTING HEARSAY TESTIMONY.
 {¶ 20} "II. THE APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.
 {¶ 21} "III. THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.
 {¶ 22} "IV. THE TRIAL COURT ERRED IN FINDING THE SIX YEAR OLD VICTIM TO BE COMPETENT TO TESTIFY."
 IV {¶ 23} For ease of discussion, we shall begin with appellant's fourth assignment of error. Herein, appellant submits the trial court erred in finding Caitlyn competent to testify as such finding was an abuse of discretion.
 {¶ 24} It is well-settled, as the trier of fact, the trial court is required to make a preliminary determination as to the competency of all witnesses, including children and, absent an abuse of discretion, competency determinations of the trial court will not be disturbed on appeal. State v. Frazier (1991),61 Ohio St.3d 247, 251. In order demonstrate an abuse of discretion, appellant must show more than error of law or judgment, he must show the trial court's attitude was unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 25} The competency of a witness to testify at trial is governed by Evid. R. 601, which provides, "Every person is competent to be a witness except: (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."
 {¶ 26} "In determining whether a child under ten is competent to testify, the trial court must take into consideration (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful."Frazier, supra at syllabus.
 {¶ 27} The Ohio Supreme Court again addressed the issue inState v. Said (1994), 71 Ohio St.3d 473:
 {¶ 28} "A competency hearing is an indispensable tool in this and similar cases. A court cannot determine the competency of a child through consideration of the child's out-of-court statements standing alone. As we explained in State v. Wilson
(1952), 156 Ohio St. 525, 46 O.O. 437, 103 N.E.2d 552, the essential questions of competency can be answered only through an in-person hearing: `The child's appearance, fear or composure, general demeanor and manner of answering, and any indication of coaching or instruction as to answers to be given are as significant as the words used in answering during the examination, to determine competency'."
 {¶ 29} The trial court conducted the following inquiry of Caitlyn:
 {¶ 30} "Q. [The Court]: Are you in school now?
 {¶ 31} "A. [Caitlyn]: (Indicating.)
 {¶ 32} "Q. Yes, you are? What's your teacher's name?
 {¶ 33} "A. Ms. Watkins.
 {¶ 34} "Q. Do you like school? * * *
 {¶ 35} "A. Yes.
 {¶ 36} "Q. What is your favorite part of school?
 {¶ 37} "A. Math.
 {¶ 38} "Q. I bet you do well in reading, too, because you could read my name out there, couldn't you?
 {¶ 39} "A. (Indicating.)
 {¶ 40} "Q. Very fine. And you have a birthday, do you celebrate your birthday?
 {¶ 41} "A. No.
 {¶ 42} "Q. Why don't you celebrate your birthday?
 {¶ 43} "A. Jehovah's Witness.
 {¶ 44} "Q. That's not something that you do. Is there anything that you do special for your birthday?
 {¶ 45} "A. No.
 {¶ 46} "Q. That's good. Do you like to watch television?
 {¶ 47} "A. Yes.
 {¶ 48} "Q. What is your favorite program?
 {¶ 49} "A. SpongeBob.
 {¶ 50} "* * *
 {¶ 51} "Q. * * * Do you know what that is? (Holding stuffed animal).
 {¶ 52} "A. Yes.
 {¶ 53} "Q. What is that?
 {¶ 54} "A. Big Bird.
 {¶ 55} "Q. And what program does Big Bird come from?
 {¶ 56} "A. Sesame Street.
 {¶ 57} "Q. My children loved Sesame Street when they were growing up. I understand there is some other characters besides Big Bird on Sesame Street.
 {¶ 58} "A. Elmo.
 {¶ 59} "* * *
 {¶ 60} "Q. * * * Now, I think you brought some of the things that you play with from home; is that right?
 {¶ 61} "A. Yes.
 {¶ 62} "Q. * * * you wanted to tell me about what you brought with you?
 {¶ 63} "A. My dolphin and my cat.
 {¶ 64} "Q. What are their names?
 {¶ 65} "A. Peanut Butter Vanilla and Flipper.
 {¶ 66} "Q. How long have you had them?
 {¶ 67} "A. I forget.
 {¶ 68} "Q. And do you take them with you? You don't take them to school?
 {¶ 69} "A. Huh-uh.
 {¶ 70} "Q. But do you play with them when you're at home?
 {¶ 71} "A. Yes.
 {¶ 72} "Q. What do you like to do with them; what do they like to do with you?
 {¶ 73} "A. I don't know. I forget.
 {¶ 74} "Q. Do you have any dolls at home?
 {¶ 75} "A. Yes.
 {¶ 76} "Q. And what are your dolls' names?
 {¶ 77} "A. I haven't named them.
 {¶ 78} "Q. Do you play things with your dolls? Do you do things with them?
 {¶ 79} "A. Yes.
 {¶ 80} "Q. What kind of things do you do with your dolls?
 {¶ 81} "A. I play doctor. I don't know.
 {¶ 82} "Q. What was it that you were thinking about when you named your cat? Because that's a very good name. It's fun to say, isn't it?
 {¶ 83} "A. (Indicating.)
 {¶ 84} "Q. And do you remember how you came up with the name for your dolphin?
 {¶ 85} "A. Yes.
 {¶ 86} "Q. No?
 {¶ 87} "A. I said yes.
 {¶ 88} "Q. What was it that made you name your dolphin the way that you did, Caitlyn?
 {¶ 89} "A. Because of their colors and the dolphin because he likes to flip a lot.
 {¶ 90} "Q. That is very good. Do you see the water machine over there in the corner?
 {¶ 91} "A. Yes.
 {¶ 92} "Q. If I were to go over there and look at that water machine, would you just get up from your chair, go over there and look? If you would look in the jug, what's on the top of that besides water? Do you see anything in there?
 {¶ 93} "A. No.
 {¶ 94} "Q. If I were to tell you there was a fish in there, would I be telling you the truth?
 {¶ 95} "A. No.
 {¶ 96} "Q. Come sit down, please. Do you ever watch Barney on television?
 {¶ 97} "A. Yes.
 {¶ 98} "Q. What color is Barney?
 {¶ 99} "A. Purple.
 {¶ 100} "Q. Barney is a dinosaur?
 {¶ 101} "A. Yes.
 {¶ 102} "Q. Do we have dinosaurs living now?
 {¶ 103} "A. No.
 {¶ 104} "Q. So is Barney a real thing like a dog or a cat that you would see in your neighborhood or a horse that you would see in a pasture, or is he imaginary?
 {¶ 105} "A. Imaginary.
 {¶ 106} "* * *
 {¶ 107} "Q. * * * Let me show you a drawing. Can you tell me what that looks like to you?
 {¶ 108} "A. A cat.
 {¶ 109} "Q. I'm going to tell you what these two boys are saying about that cat. And then I will ask you which one told the truth and which one didn't tell the truth. This boy looks at that and says it's a cat. This boy looks at that and says that it is a puppy. Which boy told the truth?
 {¶ 110} "A. That one.
 {¶ 111} "Q. The one on the left, the first one?
 {¶ 112} "A. Yes.
 {¶ 113} "* * *
 {¶ 114} "Q. Now, let me show you this one. What would you say that is?
 {¶ 115} "A. Pizza.
 {¶ 116} "Q. Listen to what these girls say about this pizza. One of them will tell a lie and one will tell the truth. This girl says that is a hot dog. This girl says that is pizza. Which girl told the lie?
 {¶ 117} "A. The one on the left.
 {¶ 118} "Q. * * * Show you another one. What is that?
 {¶ 119} "A. A Teddy Bear.
 {¶ 120} "Q. Listen to what these boys say about the Teddy Bear. One will tell a lie and one will tell the truth. This boy says that is a book. This boy says that is a Teddy Bear. What boy told the truth?
 {¶ 121} "A. The one on the right.
 {¶ 122} "* * *
 {¶ 123} "Q. What is that? What kind of toy is that?
 {¶ 124} "A. A truck.
 {¶ 125} "Q. A truck. Listen to what these girls say about this truck. One of them will tell a lie. One will tell the truth. This girl looks at that and says that is a truck. This girl looks at that and says it's a plane. Which girl told the lie?
 {¶ 126} "A. The one on the left — right.
 {¶ 127} "Q. * * * Now, here is a judge. She wants to know what happened to these boys. One boy is going to get into trouble for what he says. And you tell me which boy is going to get into the trouble. Caitlyn, this boy is going to tell the truth. This boy is going to tell a lie. Which boy is going to get into trouble?
 {¶ 128} "A. The one on the right.
 {¶ 129} "Q. Thank you. Here is a lady who comes visit these girls at home. They want to know what happened to these girls. One of these girls is going to get into trouble for what she says. Look, Caitlyn. This girl tells a lie. This girl tells the truth. Which girl is going to get into trouble?
 {¶ 130} "A. The one on the left.
 {¶ 131} "Q. I'm going to circle that one. Here is a doctor. She wants to know what happened to these boys. One of these boys is going to get into trouble for what he says. Look, Caitlyn. This boy tells a lie. This boy tells the truth. Which one is going to get into trouble?
 {¶ 132} "A. The one on the left.
 {¶ 133} "Q. Here is a grandma. She wants to know what happened to these girls. One of these girls is going to get into trouble for what she says. Caitlyn, this girl tells the truth. This girl tells a lie. Which girl is going to get into trouble?
 {¶ 134} "A. The one on the right.
 {¶ 135} "* * *
 {¶ 136} "Q. Is it a good thing to tell a lie?
 {¶ 137} "A. No.
 {¶ 138} "Q. Is it a bad thing to tell a lie?
 {¶ 139} "A. Yes.
 {¶ 140} "Q. What grade in school are you now, Caitlyn?
 {¶ 141} "A. First.
 {¶ 142} "Q. And we have been talking about the pictures that we looked at in terms of who told a lie and who told the truth. Do you know the difference between right and wrong, do you know the difference?
 {¶ 143} "A. No.
 {¶ 144} "Q. No? Do you know what it is to tell a lie?
 {¶ 145} "A. No.
 {¶ 146} "Q. No. If I were to say that today is Thursday, would that be the truth or would it be a lie?
 {¶ 147} "A. Lie.
 {¶ 148} "Q. Is it a good thing to tell a lie?
 {¶ 149} "A. No.
 {¶ 150} "Q. If you tell someone a lie, something that isn't true, would something happen to you?
 {¶ 151} "A. Yes."
 {¶ 152} February 11, 2005 Competency Hearing Tr. at 9-21.
 {¶ 153} From our review of the voir dire, we find the trial court's examination of Caitlyn was sufficient to establish the child was capable of "receiving just impressions of the fact and transactions" and "relating them truly." Although Caitlyn showed some confusion about the actual terms "right" and "wrong" and "truth" and "lie", she clearly demonstrated she knew the difference between telling the truth and telling a lie, and knew the consequences of telling a lie. Accordingly, we find the trial court did not abuse its discretion in finding Caitlyn was competent to testify.
 {¶ 154} Appellant's fourth assignment of error is overruled.
 I {¶ 155} In his first assignment of error, appellant submits the trial court improperly admitted hearsay testimony. Specifically, appellant takes issue with the testimony of nurse Donna Abbott relative to statements made to her by Gina Patterson regarding Caitlyn's disclosures. Appellant also challenges the trial court's admission of testimony regarding a swimming pool incident which occurred approximately six months prior to the incident for which appellant was indicted.
 {¶ 156} The admission or exclusion of evidence lies within the sound discretion of the trial court. The trial court has broad discretion in determining the admissibility of evidence, and unless there is an abuse of discretion, the trial court's decision will not be disturbed. State v. Robb, 2000-Ohio-275,88 Ohio St.3d 59, 69, quoting State v. Sage (1987),31 Ohio St.3d 173. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217.
 {¶ 157} Appellant failed to object at trial to the testimony about which he now complains. Accordingly, we review this assignment of error under a plain error analysis pursuant to Crim.R. 52(B), which provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. See,State v. Long (1978), 53 Ohio St.2d 91; State v. Cooperrider
(1983), 4 Ohio St.3d 226. An alleged error does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. State v. Stojetz,84 Ohio St.3d 452, 455, 1999-Ohio-464.
 {¶ 158} Upon review, we find, even if the trial court erroneously admitted the testimony, such was not plain error. Based upon the evidence set forth supra, we cannot say, but for this evidence, appellant would not have been convicted. Appellant admitted the events occurred, albeit, he claimed his actions were accidental.
 {¶ 159} Appellant's first assignment of error is overruled.
 II {¶ 160} In his second assignment of error, appellant asserts he was denied his right to a fair trial as a result of prosecutorial misconduct. Specifically, appellant challenges remarks made by the prosecutor during opening statements and during cross-examination of appellant that his wife, Gina Patterson, saw appellant with an erection after he and Caitlyn exited the swimming pool. Appellant maintains Gina Patterson never testified to such and these comments were highly prejudicial.
 {¶ 161} "The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. State v. Lott (1990),51 Ohio St.3d 160, certiorari denied (1990), 498 U.S. 1017,111 S.Ct. 591, 112 L.Ed.2d 596. In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial. Dardenv. Wainwright (1986), 477 U.S. 168, 106 S.Ct. 2464,91 L.Ed.2d 144. A trial is not unfair, if, in the context of the entire trial, it appears clear beyond a reasonable doubt the jury would have found the defendant guilty even without the improper comments. State v. Treesh (2001), 90 Ohio St.3d 460, 464."
 {¶ 162} Both the prosecution and the defense have wide latitude during opening and closing arguments. The trial court generally determines the propriety of statements made during opening argument. State v. Loza (1994), 71 Ohio St.3d 61, 78. Opening argument is not evidence, but is intended to advise the jury what counsel expects the evidence to show. State v. Turner
(1993), 91 Ohio App.3d 153. Therefore, the prosecutor and defense counsel may, in good faith, make statements as to what he or she expects the evidence will show. State v. Colley (1946),78 Ohio App. 425, 427.
 {¶ 163} Upon review of the prosecutor's opening statements, we find the prosecutor never stated Gina Patterson would testify she saw appellant with an erection. Rather, the prosecutor commented Gina Patterson would testify to observing appellant in the swimming pool with Caitlyn sitting on his lap, and something about the scene struck her as "not right", "funny", and "suspicious". Trial Tr. Vol. II at 202. This is exactly how Gina Patterson testified at trial. Accordingly, we find these remarks were well within the perimeters afforded to a prosecutor during opening statements. Assuming, arguendo, these statements were improper, we find the prosecutor made such in good faith as to what she expected Gina Patterson's testimony to show.
 {¶ 164} We now turn to appellant's claim of prosecutorial misconduct relative to the prosecutor's cross-examining him as to whether Gina Patterson "was lying" when she testified "she saw you in the pool and stood up that you had an erection?" Vol. II at 498. Although we find Gina Patterson never testified to seeing appellant with an erection, in the context of the entire trial, we find it appears clear beyond a reasonable doubt the jury would have found appellant guilty even without the improper comments.
 {¶ 165} Appellant's second assignment of error is overruled.
 III {¶ 166} In his third assignment of error, appellant asserts his conviction was against the manifest weight and sufficiency of the evidence.
 {¶ 167} In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus.
 {¶ 168} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, citing State v. Martin (1983),20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
 {¶ 169} Appellant was convicted of one count of gross sexual impostion, in violation of R.C. 2907.05(A)(4), which provides: "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies: * * * (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."
 {¶ 170} Appellant maintains because the State failed to present any evidence of sexual gratification and Caitlyn denied the swimming pool incident, the jury lost its way in finding him guilty.
 {¶ 171} Even without the testimony relative to the pool incident, we find there was sufficient, competent and credible evidence to prove appellant's guilt beyond a reasonable doubt under the totality of the circumstances. Caitlyn testified appellant inserted his pinky finger into her privates. Gina Patterson testified regarding her daughter's disclosure of the event. Appellant, himself, admitted such had occurred, although claimed it was accidental. We find this evidence is sufficient from which the jury could infer sexual gratification.
 {¶ 172} Appellant's third assignment of error is overruled.
 {¶ 173} The judgment of the Stark County Court of Common Pleas is affirmed.
Hoffman, J. Boggins, P.J. and Wise, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Dr. Bello was deceased at the time of trial.