[Cite as *State v. Shorter*, 2012-Ohio-2701.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| V. | ) | CASE NO. 11 MA 42 |
| | ) | |
| DAROLD SHORTER, | ) | OPINION |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 10CR184

JUDGMENT:      Affirmed

APPEARANCES:
For Plaintiff-Appellee      Paul Gains
Prosecutor
Ralph M. Rivera
Assistant Prosecutor
21 W. Boardman St., 6th Floor
Youngstown, Ohio 44503-1426

For Defendant-Appellant      Atty. J. Dean Carro
Appellate Review Office
University of Akron School of Law
Akron, Ohio 44325-2901

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: June 12, 2012

DONOFRIO, J.

{¶1} Defendant-appellant, Darold Shorter, appeals from a Mahoning County Common Pleas Court judgment convicting him of murder, following a jury trial.

{¶2} On the morning of January 28, 2010, police discovered Lamont Brown's body inside his West Earl Street home in Youngstown. Brown had been stabbed to death. A cell phone belonging to Lisa Shorter, appellant's wife, was found at the scene.

{¶3} Appellant, who was Brown's friend and neighbor, was eventually interviewed regarding the stabbing. He gave police several different versions of where he was on the night in question and what he and Brown had done that night.

{¶4} Appellant first told police he had been "scrapping" (gathering scrap metal to sell) all day, had come home around 11:45 p.m., and went to bed.

{¶5} Appellant next told police that on the night in question Brown drove him to the Family Dollar and McDonald's, but when he left Brown around midnight, Brown was still alive.

{¶6} The police then confronted appellant with his hat that appeared to be blood-stained. Appellant changed his story again and told police that after he and Brown went to the Family Dollar and McDonald's, he went to Brown's house to set up a drug deal with some "feens" (drug addicts). He stated that he fought in the street with one feen and upon returning to Brown's house, he found Brown sitting on a chair bloody and gasping for air. This was how he explained the apparent blood stain on his hat.

{¶7} Appellant then gave police one final version of what transpired on the night in question. He stated that he and Brown had entered into a joint cocaine purchase where each of them was to provide half of the money to purchase 28 grams of cocaine, which they would then sell. Appellant used the $600 his wife had given him to pay the rent to pay for his half of the drugs. But Brown had not paid the other half. Appellant confronted Brown and told him he needed the money. He also told Brown he wanted his wife's cell phone back, which he had loaned to Brown. Appellant stated that he and Brown began to argue and the argument turned into a

"scuffle." He stated that Brown grabbed a steak knife and, in response, he picked up another knife that had been sitting on the table. Appellant stated that he stabbed Brown once or twice and ran away. Brown actually suffered 35 stab wounds in several different areas of his body.

{¶8} A Mahoning County Grand Jury indicted appellant on one count of murder, a first-degree felony in violation of R.C. 2903.02(A)(D), and one count of possession of cocaine, a fifth-degree felony in violation of R.C. 2925.11(A)(C)(4)(a). On appellant's motion, the trial court ordered separate trials on the two counts.

{¶9} The matter proceeded to a jury trial on the murder charge. The jury found appellant guilty of murder. The state then dismissed the possession of cocaine count. The trial court subsequently sentenced appellant to 15 years to life in prison.

{¶10} Appellant filed a timely notice of appeal on March 17, 2011.

{¶11} Appellant raises two assignments of error, the first of which states:

THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT SHORTER PURPOSELY CAUSED THE DEATH OF THE DECEDENT IN VIOLATION OF APPELLANT SHORTER'S RIGHTS UNDER SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

{¶12} Appellant argues that the state failed to prove the element of "purposely" beyond a reasonable doubt. He contends that his taped police confession and the testimony of Dr. Joseph Ohr demonstrated circumstances inconsistent with his having a purposeful intent to cause Brown's death. Appellant points out that none of the state's witnesses were present during the altercation between Brown and him. The only evidence of what happened at Brown's house was relayed by appellant's taped confession, which was played for the jury. Appellant asserts that his confession revealed that he did not go to Brown's house with the intent to kill him. Instead, he went there to work out how the two would pay

off their debt from the drug deal. He states that his confession further revealed that he and Brown got into an argument and Brown pulled a steak knife on him, which caused him to reach for the knife that had been sitting on the coffee table. Appellant further argues that Dr. Ohr's testimony evidenced a frenzied stabbing consistent with a sudden passion or fit of rage, not a purposeful plan.

{¶13} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In essence, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113.

{¶14} The jury convicted appellant of murder in violation of R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another."

{¶15} Pursuant to R.C. 2901.22(A):

A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

{¶16} One may deduce the intent to kill from the surrounding circumstances, including the means or weapon used, its tendency to destroy life if designed for that purpose, the manner in which the wounds are inflicted, and any other facts and circumstances in evidence. *State v. Simpson*, 10th Dist. No. 01AP-757, 2002-Ohio-3717, ¶93, citing *State v. Robinson*, 161 Ohio St. 213, 218-219, 118 N.E.2d 517

(1954). A jury may infer a defendant's purpose to cause death when the defendant inflicts a wound with a deadly weapon in a manner that appears to be calculated to destroy life or inflict great bodily harm. *State v. Stallings*, 89 Ohio St.3d 208, 291, 731 N.E.2d 159, 2000-Ohio-164.

**{¶17}** Thus, we must determine whether the state produced sufficient evidence to prove that appellant acted purposely in killing Brown.

**{¶18}** The evidence as to this point was as follows.

**{¶19}** Appellant's videotaped police interview/confession was played for the jury. Appellant referred to Brown as his "buddy." (Interview Tr. 4). He described how Brown fed him after he lost his job, how Brown let his wife and son bathe at Brown's house after their water was turned off, and how Brown drove him places he needed to go. (Interview Tr. 4-6).

**{¶20}** Appellant first told police that on the day in question, he was scrapping with a man called "EB." (Interview Tr. 6). He returned home between 11:45 p.m. and midnight and went to sleep until 5:30 the next morning. (Interview Tr. 7-8).

**{¶21}** Appellant next told police that he was in Brown's house on the night in question. (Interview Tr. 15). He stated that Brown took him to the Family Dollar and to McDonald's and dropped him off at home between 8:00 and 9:00 p.m. (Interview Tr. 15). He stated that he then stayed at home the rest of the night. (Interview Tr. 17-18).

**{¶22}** The police then told appellant they had recovered his hat and it appeared to have a blood stain on it and they had information he had gone home, changed clothes, put the clothes in a plastic bag, and stayed at another house that night. (Interview Tr. 22).

**{¶23}** Appellant subsequently told police his third story. He stated that Brown took him to the Family Dollar and McDonald's. (Interview Tr. 32). Then later that evening, he went to Brown's house to sell cocaine with him. (Interview Tr. 34). The two made a drug sale to some "feens", but it turned out that the drugs were counterfeit. (Interview Tr. 34). The "feens" returned to Brown's house and appellant

got into a "scuffle" with one of them in the street. (Interview Tr. 35). He then went into Brown's house and found him "bloody." (Interview Tr. 38). After further prodding by the police, appellant elaborated by stating that he found Brown "grasping" and he moved him to the couch. (Interview Tr. 51-52).

{¶24} The police then spent some time trying to convince appellant that his stories did not add up and it would be better for him if he told the truth.

{¶25} Appellant finally told the police his fourth story. He once again stated that Brown took him to the Family Dollar and McDonald's. (Interview Tr.82). He then went back to Brown's house where he emphasized to Brown that he needed the money the two owed on their drug purchase because he was about to be evicted from his house. (Interview Tr. 82). He then asked Brown to return his wife's cell phone so that he could sell it and use the money to pay his rent. (Interview Tr. 87). The two then got into a verbal argument and appellant expressed to Brown that he had used his rent money to fund their joint drug venture and that he needed Brown's share of the money to take care of his family. (Interview Tr. 88-90). The argument turned into a "scuffle." (Interview Tr. 91). Brown then pulled out a steak knife so appellant grabbed another knife that was sitting on the nearby table. (Interview Tr. 91-92). He stabbed Brown "once or twice" and then he ran. (Interview Tr. 93). He stated that both knives should still be in Brown's house. (Interview Tr. 93-94).

{¶26} Throughout the interview, before appellant gave his final story to the police, appellant repeatedly stated that the last time he saw Brown, Brown was alive (Interview Tr. 15, 16, 26) and that he did not kill Brown (Interview Tr. 37, 42, 45, 57).

{¶27} Detective-Sergeant Pat Kelly investigated the murder scene. Detective Kelly testified that there was no sign of a struggle at Brown's house. (Tr. 414-415). He noted that the items on the coffee table were undisturbed. (Tr. 415). He also stated that the police searched the house and did not locate a knife, let alone two knives. (Tr. 374, 410).

{¶28} Dr. Joseph Ohr, a forensic pathologist for the Mahoning County Coroner's Officer, performed the autopsy on Brown's body. Dr. Ohr testified that the

best count he could get of Brown's stab wounds was 35. (Tr. 457). Stab wounds were located on Brown's cheek, under his chin, his neck, both sides of his chest, his stomach, his shoulder, and his back. (Tr. 462-473). Dr. Ohr testified that the fatal wound was one of several wounds along the right side of Brown's neck, which cut his carotid artery. (Tr. 464). He further stated that he did not find any defensive wounds on Brown's body. (Tr. 475). And the doctor did not find any injuries consistent with a physical fight such as black eyes, fat lips, broken teeth, scraped knees, bruised elbows, or punches in the stomach. (Tr. 481-482). Dr. Ohr also testified that several of the stab wounds on Brown's back all came in at the same angle, which indicated to him that Brown's body was not moving when those wounds were inflicted. (Tr. 473). Dr. Ohr additionally described some of the wounds as "chaotic," meaning that the way the wounds entered the skin indicated that Brown was moving about as they were inflicted, and other wounds as "parallel," meaning that the wounds were in an orderly fashion. (Tr. 493-494).

**{¶29}** "The number and location of a victim's stab wounds, and the manner in which they were inflicted, may support an inference of a specific intent to kill." *State v. Du,* 2d Dist. No. 2010-CA-27, 2011-Ohio-6306, ¶15, citing *State v. Hayden*, 10th Dist. No. 95APA05–559 (Sept. 16, 1997).

**{¶30}** In this case, Brown suffered 35 stab wounds. Some of the stab wounds were to his neck and chest, areas where one would aim if attempting to cause the death of another. And appellant simply left Brown to die instead of seeking medical help after he stabbed Brown, who appellant claimed was his "buddy." Even if appellant did not go to Brown's house with the intent to kill him, he could have formed that intent upon speaking with Brown. It is hard to imagine that a person would stab another person 35 times without intending to kill them.

**{¶31}** Other courts have found that the fact of multiple stabbing and other circumstances similar to those in this case led to the conclusion that the killings were purposeful. For instance, in *State v. Yoder*, 10th Dist. No. 10AP-653, 2011-Ohio-3308, the court found that the extent of the victim's stab wound allowed the jury to

infer that the defendant had a purpose to kill. The court pointed out that the victim was stabbed 18 times, and three of his stab wounds were independently fatal. *Id.* at ¶31. It further found that it was reasonable for the jury to infer that the defendant had a purpose to kill the victim because he stabbed the victim in the neck. *Id.* Finally, the court noted that the defendant showed no concern for the victim's well-being after the stabbings. *Id.* And in *State v. Hendrickson*, 4th Dist. No. 08 CA 12, 2009-Ohio-4416, ¶44, the court observed that the defendant's "act of killing Blankenship by stabbing her 14 times demonstrates a purposeful killing, not an impulsive one." Moreover, in *State v. Carter*, 89 Ohio St.3d 593, 602, 734 N.E.2d 345 (2000), the Ohio Supreme Court found that the trial court properly denied the defendant's request for a voluntary manslaughter instruction because "the evidence, including that the victim was stabbed eighteen times, fully supported a purposeful killing."

**{¶32}** Viewing the evidence in the light most favorable to the state, as we are required to do here, there was sufficient evidence from which the jury could conclude that appellant acted purposely when he stabbed Brown 35 times.

**{¶33}** Accordingly, appellant's first assignment of error is without merit.

**{¶34}** Appellant's second assignment of error states:

THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE UNDER THE OHIO CONSTITUTION SINCE THE EVIDENCE OF VOLUNTARY MANSLAUGHTER WAS UNCONTRADICTED, THEREBY WARRANTING APPELLANT'S [sic.] SHORTER'S CONVICTION FOR MURDER TO BE REVERSED PURSUANT TO THIS COURT'S AUTHORITY UNDER SECTION 3(B)(3), ARTICLE IV, OF THE OHIO CONSTITUTION.

**{¶35}** Here appellant argues that the statements he made to the police were not contradicted by the state and did not support the crime of murder. Instead, he asserts that the evidence demonstrated that he acted under a sudden fit of rage, which would only support a conviction for voluntary manslaughter. He points out that

the evidence demonstrated that he went to Brown's house on the night in question to try to collect the $600 Brown owed him for the cocaine they had purchased together. When Brown refused to pay, appellant demanded that Brown return the cell phone he had borrowed. Brown refused to return the phone and the two men began to argue. The argument turned into a "scuffle" and appellant noticed that Brown had a steak knife. Appellant then reached for another knife that was sitting on a nearby table and fatally stabbed Brown.

{¶36} Appellant argues that it was not until Brown produced a steak knife that he was provoked to use deadly force. Up until that point, the "scuffle" had not involved deadly weapons. Thus, he argues that the evidence demonstrated that he was guilty of voluntary manslaughter, not murder.

{¶37} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

{¶38} Yet granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230,

227 N.E.2d 212 (1967), paragraph one of the syllabus.  Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

**{¶39}** In addition to the evidence set out above, the following testimony must also be considered.

**{¶40}** Quatoyia Williams is the mother of Brown's child.  She testified that Brown spoke of appellant as someone who had moved into the neighborhood and whom Brown was "helping out."  (Tr. 295).

**{¶41}** Officer Samuel Mosca responded to the 911 call and, along with his partner, was the first emergency responder to the scene.  He found Brown's body face down in the living room covered in blood.  (Tr. 307).

**{¶42}** Janeraro Brown, Brown's brother, testified that he was on the phone with Brown sometime between 12:45 and 1:00 a.m. when Janeraro heard the doorbell ring at Brown's house, interrupting their conversation.  (Tr. 326-327).  Brown said over the phone, "oh, here's this MF'er."  (Tr. 327).  Janeraro testified that he knew/assumed it was appellant who was at Brown's door because appellant was constantly "bugging" Brown to help him with food, water, and transportation.  (Tr. 327-328).

**{¶43}** Lisa Shorter is appellant's wife.  She testified that on the night in question appellant came home at approximately 2:30 a.m. with blood on his coat. (Tr. 340).  She also testified that appellant and Brown were friends.  (Tr. 349).

**{¶44}** Appellant argues that the evidence only proved that he was guilty of voluntary manslaughter because he was "provoked" into a "sudden fit of rage" by Brown's refusal to pay for a portion of the drugs or to return the borrowed cell phone. The voluntary manslaughter statute provides:  "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."  R.C.

2903.03(A). Appellant's argument, as it was above, is basically that he did not act purposely in killing Brown.

**{¶45}** In order for provocation to be reasonably sufficient, it must arouse an ordinary person's passions beyond his control. *State v. Bickerstaff*, 7th Dist. No. 09-JE-33, 2011-Ohio-1345, ¶17, citing *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992). Additionally, on a subjective level, the emotional and mental state of the defendant and the surrounding circumstances must also be considered. *Id.*, citing *State v. Deem*, 40 Ohio St.3d 205, 211, 533 N.E.2d 294 (1988).

**{¶46}** There are several problems with appellant's argument, however. The biggest problem is appellant's lack of credibility. He contends that the jury should have believed his fourth story to the police. But appellant demonstrated through his multiple stories and denials that he could not be trusted to tell the truth. In order to find that appellant was guilty of voluntary manslaughter, instead of murder, the jury would have to have believed appellant's fourth statement to the police that Brown provoked him into a sudden fit of rage by pulling a knife on him. Given appellant's demonstrated propensity to lie, it was within the jury's province to disbelieve appellant when he stated that Brown produced a knife.

**{¶47}** Another problem is that even appellant's fourth story is contradicted by the physical evidence. Appellant told police that he stabbed Brown once or twice. But Dr. Ohr found 35 stab wounds on Brown's body. Additionally, appellant claimed that he and Brown got into a physical "scuffle." However, Detective Kelly testified that there was no sign of a struggle at Brown's house and Dr. Ohr testified that there were no signs on Brown's body that he had been involved in a physical fight. And appellant stated that police would find two knives in Brown's house, the one that he used and one that Brown pulled on him. But the police did not find any knives in Brown's house. This casts further doubt on whether Brown even had a knife.

**{¶48}** Finally, appellant focuses his argument on his contention that he acted in a sudden fit of rage in stabbing Brown. But in order to find appellant guilty of voluntary manslaughter, in addition to finding that he acted in a sudden fit of rage, the

jury also had to find that the fit of rage was brought on by serious provocation by Brown that was reasonably sufficient to incite appellant into using deadly force. It was within the jury's province to find that there was not sufficient provocation to support a finding of voluntary manslaughter.

{¶49} Considering all of the evidence and appellant's lack of credibility, the jury did not lose its way in finding appellant guilty of murder.  As such, their verdict was not against the manifest weight of the evidence.

{¶50} Accordingly, appellant's second assignment of error is without merit.

{¶51} For the reasons stated above, the trial court's judgment is hereby affirmed.


Waite, P.J., concurs.

DeGenaro, J., concurs.