[Cite as *State v. Almazan*, 2016-Ohio-5408.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 103563

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## HECTOR ALMAZAN

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-589365-A

**BEFORE:** Boyle, J., McCormack, P.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 18, 2016

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio   44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Carl Mazzone
         Anna M. Faraglia
         Melissa Riley
Assistant County Prosecutors
Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1} Defendant-appellant, Hector Almazan ("Almazan"), was convicted of aggravated murder and sentenced to a life sentence without the possibility of parole. He appeals his conviction. Finding no merit to the appeal, we affirm.

**A.   Procedural History and Facts**

{¶2} On September 16, 2014, Aura Morales ("Aura") was found dead shortly after 3:00 a.m. on the back porch of her residence on East 57th Street in Cleveland, Ohio. Aura had been stabbed 39 times and her throat had been slashed. Almazan, who had previously been in a 20-year relationship with Aura and fathered three children with her, was arrested and indicted on the following seven counts in connection with the homicide: two counts of aggravated murder, kidnapping, murder, two counts of felonious assault, and domestic violence. Almazan pleaded not guilty on all the charges, and the matter proceeded to a jury trial.

{¶3} The state presented 22 witnesses at trial. We summarize the relevant testimony as follows.

**1. Almazan's Relationship with Aura (the Victim)**

{¶4} Hector Morales ("Hector"), Almazan and Aura's oldest son (who was 20 at the time of trial), testified as to the relationship between his parents. In January 2014, Hector was living with his father, along with his mother and his younger sister, at a residence located on Scranton Avenue in Cleveland. Hector's younger brother, Jason,

was living with his girlfriend at the time. According to Hector, in May 2014, his father discovered that his mother was having an online relationship with someone on Facebook, which made his father extremely angry. Hector testified that "he pulled out a machete" and "was threatening mom that he would kill her if she did not leave the house." Hector further testified that his mother did not leave that night but slept in his sister's room.

{¶5} Hector, his mother, and his sister ultimately moved out of his father's house on Scranton Avenue and into the home on East 57th Street.

{¶6} In July 2014, Aura, on behalf of herself and her three children, obtained a civil protection order against Almazan. The following month, Hector accompanied his mother to the police station. According to the testimony of Cleveland police officer Rafael Rodriguez, who handled the report, Aura filed a police report against Almazan, alleging that Almazan had raped her on July 11, 2014.

## 2. Almazan's Relationship with Fidelina Umana

{¶7} In July 2014, after Aura had moved out of Almazan's house on Scranton Avenue, Almazan's girlfriend, Fidelina Umana, relocated from California and moved into Almazan's residence. Umana, who had first met Almazan in El Salvador in 2009, testified that she had lost touch with Almazan but reconnected with him in March 2014. In August 2014, Umana's daughter, M.E., arrived in Cleveland. According to Umana, Almazan was very generous to her daughter, and the three of them operated as a family. Umana further testified that Almazan helped M.E. after she had been raped by Almazan's

cousin; Almazan helped M.E. report the rape to the police and helped her get medical attention.

{¶8} Through M.E.'s case, Almazan learned that Aura had filed a police report against him for rape. According to Umana, Almazan denied having raped Aura and told her that Aura had set a "trap" for him. Umana stated that after learning about Aura's accusation, Almazan's "mind was programming."

### 3. Almazan's Actions on Setember 15, 2014 — the Day Before the Homicide

{¶9} Umana testified that on September 15, 2014, Almazan went to work at 5:30 a.m. and that at 3:00 p.m., she accompanied him to submit to DNA testing for child support purposes. Upon returning home, the two of them had dinner and then watched a soap opera. According to Umana, Almazan fell asleep while watching television but woke up when his mother called. Almazan spoke to his mother for approximately 25 minutes, went upstairs, and then returned with $3,000. Umana further testified that Almazan said "that his mind was programmed; that the day had arrived" and "that was the day that he had planned." He then proceeded to sharpen a kitchen knife with an "emery grinder," wrapped the knife in a napkin, and placed it in his vehicle. Umana testified that Almazan then left for Walmart where he purchased a black "hoodie" and returned with a six-pack of beer. Umana stated that she was afraid of Almazan at this point.

{¶10} Umana further testified that, while the two were sitting on the back porch and drinking a beer, Almazan abruptly grabbed her by the hair and pulled her head back, stating that "he was just practicing." He then said, "today's the day." Umana

questioned him what he meant by the statement, and he clarified, "today's the day that she's going to die," and then expressly identified Aura. Almazan told Umana that he was not going to go to jail and was not going to give money for his kids. At some point, Almazan began crying and indicated that he was not going to go through with it, which Umana believed.

{¶11} Almazan slept on the couch that night while Umana went upstairs and locked her door. She testified that she heard Almazan leave the house in his truck. When he returned, around 3:30 a.m., Almazan ran to the sink and washed his hands with soap and water. He then kneeled down with his hands in a praying position, stating "God, forgive me. I have never killed and I have never raped." He then got up and stated that he was going to turn himself in to the police.

{¶12} Umana then called Almazan's brother, Elvis, who lives in Missouri.

{¶13} Umana admitted that she did not tell the police everything when they first questioned her because she was afraid, believing that Almazan was still "out there" and could harm her.

### 4. Early Morning of September 16, 2014

{¶14} Hector testified as to Aura's normal work schedule being 5:00 p.m. to 3:00 a.m. and that her work schedule was the same as when they all lived with Almazan on Scranton Avenue.

{¶15} Early in the morning on September 16, 2014, around 3:00 a.m., Hector woke up, hearing a scream. Hector testified that he "didn't know who screamed like that" and

thought that it was someone "playing a joke." Upon hearing the scream, he got out of bed, retrieved a glass of water, and then checked on his mother, who was not in her bedroom. He then proceeded downstairs where he saw the door open and his mother's "lifeless body there," with "a pile of blood around her head area." Hector observed his father's hammer near the body and picked it up. Hector then went downstairs and asked the neighbors to call the police and an ambulance.

{¶16} Hector's neighbor also testified that "a little after 3:00 a.m.," she heard a strange screaming, howling-type sound, thinking it may have been dogs. She eventually looked outside and saw Hector, who told her that his mother had died. The neighbor's boyfriend called 911, and the neighbor went outside to check on Hector and his younger sister. According to the neighbor, Hector was in shock and distraught. He kept picking up the hammer, despite the neighbor's boyfriend trying to prevent him from touching it.

### 5. Police Investigation

{¶17} Cleveland police officers arrived on the scene following the 911 call. According to Cleveland police officer Brandon Melbar, Hector was shaking and upset while he questioned him. Hector alerted the police on the scene that his father may be responsible for the killing. The police further learned of the civil protection order obtained by Aura against Almazan and sent a zone car to Almazan's residence on Scranton Avenue. Upon arriving there, Umana told them that Almazan was not home. Police later sent a zone car to Almazan's place of employment at Citizen Academy where Almazan worked as a custodian.

{¶18} On the back porch, the police recovered the hammer found near the victim's body that had blood spattered on it. The DNA on the hammer was later determined to match Aura's. Behind the victim's backyard fence and against the garage of a neighboring house, the police found a knife with blood on it, which also was later confirmed to match Aura's DNA. Cleveland police detective James Raynard testified that he believed "someone had scaled the fence and jumped off of it" based on the "deep impressions" that he noticed in the grass clippings by the fence.

{¶19} Sergeant Deidre Jones testified that, after learning that Almazan had family in Missouri, she placed a "be on the lookout" (BOLO) for Almazan and his vehicle, indicating that it may be headed to Missouri. The same day of discovering Aura's body, the Cleveland police also contacted the local police in Missouri where Almazan had family.

### 6. Aura's Death Ruled a Homicide

{¶20} Dr. Andrea McCollum, who works for the Cuyahoga County Medical Examiner's Office, performed the autopsy. According to Dr. McCollum, the cause of Aura's death was "multiple stab and incise wounds of head, neck, trunk and extremities with skeletal, visceral, and vascular injuries." Dr. McCollum further testified that she ruled the death a homicide.

### 7. Almazan Fails to Appear for Work, Travels to Missouri, and Makes Inculpatory Statements to Missouri Police Officers

**{¶21}** The state presented the testimony of Nicole Tomkins, director of operations at Citizens Academy. According to Tomkins, Almazan failed to report to work on September 16, 2014, despite not requesting the day off. Tomkins further testified that Almazan was "always punctual" and "always at work" and that his unexcused absence was "completely out of character."

**{¶22}** On September 16, 2014, the Marshall police department in Marshall, Missouri received a telephone call from an unknown source, informing them of Almazan's location in their jurisdiction. After confirming that there was an active arrest warrant for Almazan, four Marshall police officers apprehended and arrested Almazan at his brother's residence.

**{¶23}** Marshall police officer Mark Pitts testified that, after Almazan was placed in handcuffs, he stayed with Almazan while waiting for the patrol car. According to Officer Pitts, "there was no conversation," but Almazan spontaneously uttered, "I did it, I wasn't trying to run away. I just wanted to see my family before I go away." Officer Pitts further testified that he did not respond to Almazan's statements because he "didn't want to get into any type of communication with him," knowing that Almazan had not been read his *Miranda* rights.

**{¶24}** Marshall police officer Matt Renfrow testified that he handled the initial booking process of Almazan after he had been transported to the Marshall police department. Officer Renfrow testified that the booking process involved obtaining "basic information about the individual," such as the person's date of birth, social security

number, address, and phone number. According to Officer Renfrow, during the booking process, Almazan volunteered that "he was going to turn himself in anyway. You can't get away with killing somebody these days." Officer Renfrow further testified that he did not acknowledge Almazan's statements and placed him in a holding cell after completing the booking process. Shortly thereafter, Almazan was transported to the Saline county jail.

{¶25} Saline County sheriff's deputy Chad McReynolds testified that he handled the booking of Almazan at the county jail. According to Deputy McReynolds, upon asking Almazan basic questions during the booking process, including whether Almazan had family in the area, Almazan indicated that he had family in Marshall and that "he just wanted to see them for one last time." Deputy McReynolds testified that he did not respond to the comment but that, during the strip search, Almazan further stated that "he just wants to get the death penalty and get it over with."

{¶26} FBI special agent Sean McDermott handled the interview of Almazan while he was in custody. Almazan spoke with Agent McDermott after being told his *Miranda* rights. Almazan discussed his previous relationship with Aura, stating that he confronted Aura about her online affair, to which she indicated that she did not love him anymore. Almazan further told Agent McDermott that after they separated, Almazan went to Aura's house to fix the water heater, resulting in Almazan and Aura engaging in consensual sex. Two days later, however, Almazan learned that Aura was going to get a restraining order against him. Almazan further stated that he later learned that Aura accused him of

raping her, that he consulted an attorney, and that he believed it was "unlikely that he would prove his innocence" because it was a "he said/she said" scenario. During the interview, Almazan did not confess to the killing of Aura. Almazan indicated that the other officers mistakenly "misunderstood him." Almazan further told Agent McDermott that he "spontaneously" decided to visit Marshall and that he was planning on quitting his job and getting a new job in Marshall.

### 8. Aura's Blood Found on Almazan's Shoe and Inside His Vehicle

{¶27} Dan Mabel, a forensic scientist in the Cuyahoga County Medical Examiner's Office, testified that he examined a small piece of dried vegetation that had been collected from the driver front vacuum filter during the search of Almazan's vehicle, which tested presumptively positive for blood. DNA analysis conducted on the vegetation revealed that the DNA matched the victim's DNA. The state also presented evidence that Almazan's left shoe, which was retrieved upon his arrest, contained blood. The DNA profile on the shoe matched the DNA profile of the victim.

### 9. Almazan's Sister Testifies that Almazan Admitted to Killing Aura

{¶28} Almazan's sister, Elsy Almazon, testified that on September 16, 2014, between 1:30 p.m. and 2:00 p.m., Almazan knocked on her door. Elsy explained that she was scared to open the door because she had received a call earlier from her brother Elvis, who alerted her of the allegations in Cleveland. Elsy eventually let Almazan inside her house and asked him if he killed Aura, to which he replied "yes." According to Elsy, Almazan stayed for approximately 20 minutes because she had to leave. During that

time, he told her the details of his crime — how he drove to Aura's house, parked a few blocks away, and then killed Aura with a knife, stabbing her on her chest and then her throat. According to Elsy, "he did it because she was making accusations that were not true."

{¶29} Elsy testified that, after Almazan left her house, she called her brothers but could not reach them. She ultimately reached her nephew, who telephoned the police. Elsy further indicated that it was "very difficult" to testify against her brother, whom she loves.

## 10. Jury Verdict and Sentence

{¶30} Almazan was found guilty on all of the counts. The counts merged for sentencing, and the state elected to proceed on Count 1, aggravated murder. The trial court ultimately imposed a life sentence without the possibility of parole.

{¶31} Almazan appeals, raising the following four assignments of error:

I. The trial court erred by denying appellant's motion in limine and allowing the state to introduce hearsay evidence and other acts evidence in violation of Evidence Rules 401, 402, 403, and 404(B) and appellant's constitutional rights to due process, a fair trial and to confront witnesses.

II. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motions for acquittal.

III. The convictions were against the manifest weight of the evidence.

IV. Appellant's rights under the Fifth and Sixth Amendments to the Constitution of the United States were violated.

## B. Evidentiary Rulings

**{¶32}** In his first assignment of error, Almazan argues that the trial court erred in allowing the admission of the following other acts evidence: (1) Almazan's threatening Aura with a machete in the presence of their son Hector in May 2014; and (2) Aura's filing of a police report on August 7, 2014, accusing Almazan of raping her.

**1. Machete Incident**

**{¶33}** Almazan first argues that the trial court erred in allowing the evidence of the machete incident under Evid.R. 404(B) because the state failed to satisfy the three-part test set forth in *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278.

**{¶34}** Evid.R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may, however, be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).

**{¶35}** In determining whether to permit other acts evidence to be admitted, trial courts should conduct the three-step analysis set forth in *Williams* at ¶ 20:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence, Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R. 403.

**{¶36}** While we ordinarily apply an abuse of discretion standard of review to a trial court's decision on the admission of evidence, including evidence of other acts under Evid.R. 404(B), Almazan did not object to the testimony regarding the machete incident at trial.[1] Under such circumstances, Almazan has waived all but plain error.

**{¶37}** "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Crim.R. 52(B) places the following three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial: (1) there must be error; (2) the error must be an "obvious" defect in the trial proceedings; and (3) the error must have affected "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. The Ohio Supreme Court has interpreted the third limitation of the rule "to mean that the trial court's error must have affected the outcome of the trial." *Id.* In other words, plain error requires that "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431, 678 N.E.2d 891 (1997).

---

[1]The record reflects that, prior to trial, Almazan objected to the state's intent to use other acts evidence, which included the machete incident, and filed a motion in limine to exclude such evidence. The trial court denied Almazan's motion in limine regarding the machete incident. But "the denial of a motion in limine, does not preserve a claimed error for review in the absence of a contemporaneous objection at trial." *State v. Hill*, 75 Ohio St.3d 195, 203, 661 N.E.2d 1068 (1996). *See also State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 59 (applying plain error doctrine to evidentiary issue that was subject of motion in limine but not objected to during trial).

**{¶38}** Here, Almazan does not demonstrate that the admission of the machete testimony constitutes plain error. And based on the overwhelming evidence of Almazan's guilt in this case, including his own confession to his sister and girlfriend, we cannot say that the admission of the evidence affected his substantial rights.

### 2. Rape Allegation

**{¶39}** Almazan next argues that the trial court "erred in admitting the allegations of rape because it was hearsay, and it violated Evid.R. 403 and 404(B)."

**{¶40}** In addition to filing a motion in limine regarding any testimony of Aura's rape allegation, Almazan also objected to the admission of the testimony at trial. We, therefore, review for an abuse of discretion. *See State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 22 (trial court has broad discretion in the admission and exclusion of evidence, including evidence of other acts under Evid.R. 404(B)). We likewise review rulings regarding hearsay under an abuse of discretion standard. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944. The Ohio Supreme Court has defined an "abuse of discretion" as an "unreasonable, arbitrary, or unconscionable use of discretion, or as a view or action that no conscientious judge could honestly have taken." *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23.

**{¶41}** Almazan argues that Aura's out-of-court statements that he allegedly raped her constitute inadmissible hearsay, which do not qualify under the forfeiture-by-wrongdoing exception of Evid.R. 804(B)(6). He further contends that the statements were testimonial in nature and violated his rights to confrontation guaranteed

under the United States Constitution. While both parties analyze the admissibility of the statements under Evid.R. 804(B)(6) and under the forfeiture-by-wrongdoing exception to the Confrontation Clause of the Sixth Amendment, we find that the statements were admissible for a more fundamental reason: they were not hearsay as defined under Evid.R. 801(C).

**{¶42}** "'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered into evidence to prove the truth of the matter asserted." Evid.R. 801(C). A statement is not hearsay when offered for a purpose other than to prove the truth of the matter asserted. *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 118.

**{¶43}** The state offered testimony that Aura filed a police report stating that Almazan raped her and that Almazan learned of the allegation. The state, however, did not introduce the testimony regarding the rape allegation to prove that Almazan raped Aura, but rather, the evidence was offered to show Almazan's motive for killing Aura. The truth of whether Almazan actually raped Aura was irrelevant to the charges that Almazan faced at trial. Indeed, the state offered the evidence of the rape allegation to show that the allegation incensed Almazan because he believed them to be false. The relevance of the statement was offered simply to show its effect on Almazan — not for the truth of the matter asserted.

**{¶44}** We likewise cannot say that the statement's admission violates the Confrontation Clause. As noted by the Ohio Supreme Court, "'The Clause * * * does

not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *Osie* at ¶ 126, quoting *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), fn. 9.

**{¶45}** Next, we turn to the issue of whether the evidence of Aura's rape allegations should have been excluded under the three-step analysis set forth in *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278. According to Almazan, the statements were offered solely to show that he has a bad character and that he acted in conformity with the bad character. He contends that the evidence was not relevant to any fact that was at issue in the case and the probative value, if any, was outweighed by the danger of unfair prejudice that resulted. We disagree.

**{¶46}** As discussed above, the state offered the evidence of the rape allegation for a legitimate purpose, namely, to prove motive under Evid.R. 404(B). This evidence was also relevant to give context to Almazan's actions and statements following his learning of Aura's allegations. And although we recognize that evidence of the rape allegation was prejudicial, its probative value substantially outweighed the danger of unfair prejudice. Accordingly, we cannot say that the trial court abused its discretion in allowing the "other-acts" evidence.

**{¶47}** The first assignment of error is overruled.

**C. Sufficiency of the Evidence**

{¶48} In his second assignment of error, Almazan argues that the state failed to present sufficient evidence to support a conviction on all counts of the indictment. We disagree.

{¶49} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶50} The gravamen of Almazan's sufficiency challenge is that the state failed to "sufficiently establish that he was an assailant or at all involved in the crimes alleged in the indictment." According to Almazan, the "state's identification evidence is so lacking" and insufficient to support the convictions. We disagree.

{¶51} Aside from Almazan's own inculpatory statements to members of the Missouri law enforcement after having left Ohio immediately following the murder of Aura, the state presented two separate witnesses — Almazan's girlfriend (Umana) and his sister (Elsy) — who both testified that Almazan confessed to killing Aura. To the extent that Almazan argues that Umana's testimony is wholly unbelievable, such an argument

relates to the manifest weight of the evidence and not a sufficiency challenge. Additionally, the state presented evidence of the victim's blood being both on Almazan's shoe, as well as on a piece of vegetation found in his vehicle. We find overwhelming evidence supporting the identity of Almazan as the assailant.

{¶52} Almazan further broadly asserts that "the evidence was insufficient to sustain a conviction for felony murder because there is insufficient evidence that [he] committed any of the predicate offenses of felonious assault or kidnapping." We find no merit to this claim. Aura was stabbed 39 times, which clearly supports the felonious assault offense. Additionally, contrary to Almazan's claim, the mere fact that Aura was found on her porch does not defeat a kidnapping charge. Almazan was indicted for kidnapping under R.C. 2905.01(A)(3). The count did not arise based on an allegation that he removed her from her location, but rather that he "did by force, threat or deception, purposely restrain the liberty of Aura * * * for the purpose of terrorizing or inflicting serious physical harm upon [her]." Based on Aura's injuries, which were so numerous and severe that Dr. McCollum could not determine the order of their occurrence or identify the specific injury that caused Aura's death, the evidence supports a finding that Almazan unlawfully restrained her liberty for the purpose to terrorize or inflict serious physical harm.

{¶53} The second assignment of error is overruled.

**D. Manifest Weight of the Evidence**

**{¶54}** In his third assignment of error, Almazan argues that his convictions are against the manifest weight of the evidence.

**{¶55}** Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

**{¶56}** In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶57}** Almazan argues that the absence of any forensic or DNA evidence at the actual scene exculpates him from the crime. As for the physical evidence linking him to the crimes, i.e., Aura's blood on his shoe and on the vegetation found in his vehicle, he

argues that its presence is explained by their 20-year relationship. He further argues that Hector and Umana were biased against him and that Umana's testimony, which varied significantly from her original statement to the police, was "incredible." Finally, Almazan contends that the statements made to the law enforcement member in Missouri are "uncorroborated and unreliable." We find these arguments unpersuasive.

{¶58} Almazan's manifest weight of the evidence challenge ignores the testimony of Almazan's sister, Elsy. According to Elsy's testimony, Almazan confessed to the crimes and even shared details that she would not have otherwise known. Unlike Almazan's attack of Umana's character and bias, the record reveals that Elsy loved her brother and had no bias against him. We likewise cannot say that the jury lost its way in believing Elsy or the state's other witnesses linking Almazan to the crimes, especially given the physical evidence found in Almazan's car, as well as his actions of fleeing to Missouri.

{¶59} Thus, after reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we do not agree with Almazan that "in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶60} The third assignment of error is overruled.

**E. Ineffective Assistance of Counsel**

**{¶61}** In his final assignment of error, Almazan argues that he was denied his constitutional right to effective assistance of counsel. Almazan contends that his trial counsel was deficient in the following three areas: (1) failing to object to the testimony that he allegedly made while in police custody; (2) failing to object to the prosecutor's prejudicial and unsupported comments in opening and closing arguments; and (3) failing to file an affidavit of indigency to allow the court to waive the imposition of costs.

**{¶62}** Reversal of a conviction for ineffective assistance of counsel requires a defendant to show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *State v. Smith*, 89 Ohio St.3d 323, 327, 731 N.E.2d 645 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defense counsel's performance must fall below an objective standard of reasonableness to be deficient in terms of ineffective assistance of counsel. *See State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Moreover, the defendant must show that there exists a reasonable probability that, were it not for counsel's errors, the results of the proceeding would have been different. *State v. White*, 82 Ohio St.3d 16, 23, 693 N.E.2d 772 (1998).

### 1. *Miranda* **Warnings**

**{¶63}** Almazan argues that his defense counsel was deficient by failing to object to Officer Pitts's testimony as to Almazan's statements while in police custody and prior to any *Miranda* warning. Specifically, he points to the following statements where he allegedly said, "I did it, I wasn't trying to run away. I just wanted to see my family

before I go away." Almazan further argues that his defense counsel was ineffective by failing to object to Officer Renfrow's testimony that he stated (without *Miranda* warnings), "You can't get away with killing somebody these days."

**{¶64}** The state counters that defense counsel was not deficient because these statements were voluntary and unsolicited. While Almazan has argued that he was in custody at the time of these statements, he fails to offer any argument that the statements were induced or coerced by police interrogation. As explained by the United States Supreme Court, a defendant's voluntary comments and confessions are not covered by the *Miranda* ruling:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. * * * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Arizona v. Miranda*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1996). *Accord Rhode Island v. Innis*, 446 U.S. 291, 299-300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

**{¶65}** In *Innis*, the Supreme Court defined the term "interrogation" for purposes of *Miranda* as including not only express questioning, "but also * * * any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301.

**{¶66}** Based on the record before us, we fail to find evidence to support a claim

that Officers Pitts and Renfrow coerced or induced the statements that Almazan now challenges as being inadmissible. We, therefore, cannot say that defense counsel was deficient in not objecting to these statements. *See State v. Ballard*, 8th Dist. Cuyahoga Nos. 88263 and 88305, 2007-Ohio-1847, ¶ 14 (voluntary, spontaneous statements made without police coercion or inducement do not fall within the protection of *Miranda* even if the defendant was under arrest and in custody).

**{¶67}** Even if we agreed that the "booking process" and Officer Renfrow's questions regarding basic information, such as defendant's name and date of birth, should have required *Miranda* warnings, we nonetheless find no prejudice in this case. The record simply does not support a finding that a reasonable probability exists that the outcome would have been different if these statements were excluded. Indeed, Almazan confessed to both his girlfriend and his sister within 24 hours of committing the crimes.

### 2. Objection to Opening and Closing Statement

**{¶68}** Almazan next argues that his defense counsel was ineffective by failing to object to the prosecutor's statements in opening and closing arguments that he threatened to cut Aura's head off during the machete incident. Almazan argues that, although Hector testified that Almazan brandished the machete and threatened to "kill" Aura, Hector never testified as to Almazan threatening to "cutting her head off." We find no ineffective assistance of counsel based on this argument.

**{¶69}** First, we note that the jury was instructed that the prosecutor's comments made during opening and closing statements are not evidence. Second, we cannot

second-guess defense counsel's decision not to object to the singular statement when such an objection may have only brought more attention to Almazan's actual threat to kill Aura while holding the machete. Finally, we cannot agree that these statements prejudiced Almazan. Aside from being very similar to the actual statement made by Almazan in Hector's presence, we cannot say that a reasonable probability exists that the outcome of the trial would have been different if the statements had not been made. **3.**

**Affidavit of Indigency**

{¶70} Lastly, Almazan argues that his trial counsel was ineffective by failing to file an affidavit of indigency in support of his waiver of costs. Relying on this court's decision in *State v. Blade*, 8th Dist. Cuyahoga Nos. 88703, 88704, and 88705, 2007-Ohio-5323, Almazan argues that the failure to file an affidavit of indigence is ineffective assistance of counsel if the record shows there is a reasonable probability that the defendant would have been found indigent.

{¶71} R.C. 2947.23 requires an imposition of court costs on a criminal defendant. R.C. 2949.092 states that the court may not waive these costs unless the court determines, upon motion, that the offender is indigent. *See State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393 (noting that R.C. 2949.092 is permissive in nature).

{¶72} In *Blade*, an indigent defendant was resentenced and his attorney did not request that the court waive costs, despite the fact that the costs had been waived at his previous sentencing. Finding that nothing had changed in the defendant's circumstances in the time between the two sentencing hearings, this court found "no justification for

counsel's failure to request a waiver of costs during resentencing and conclud[ed] that counsel violated an essential duty owed to the client." *Blade* at ¶ 12.

**{¶73}** But unlike the facts in *Blade*, Almazan has failed to demonstrate a reasonable probability that he would have been found indigent if his counsel had filed an affidavit. *See, e.g., State v. Hayden*, 8th Dist. Cuyahoga No. 90474, 2008-Ohio-6279 (distinguishing *Blade* and finding no ineffective assistance of counsel when there is no showing of a "reasonable probability" that the court would have waived costs). Indeed, the record reflects that Almazan had retained counsel during trial, and that he had some assets. We, therefore, can only conclude that trial counsel's failure to file an affidavit of indigency did not prejudice Almazan.

**{¶74}** Having found that none of the stated grounds advanced by Almazan rise to the level of ineffective assistance of counsel, we overrule the fourth assignment of error.

**{¶75}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

TIM McCORMACK, P.J., and
EILEEN T. GALLAGHER, J., CONCUR