[Cite as *State v. Miller*, 2016-Ohio-7606.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103591**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## RONALD MILLER

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-573137-A

**BEFORE:**   McCormack, J., Jones, A.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**   November 3, 2016

**ATTORNEY FOR APPELLANT**

Robert A. Dixon
4403 St. Clair Ave.
Cleveland, OH 44103


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Carl Mazzone
Gregory Mussman
Assistant County Prosecutors
9th Floor, Justice Center
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

{¶1} Defendant-appellant Ronald Miller appeals from his conviction for attempted aggravated murder, attempted murder, and felonious assault. Following a thorough review of the record, we affirm.

Procedural History

{¶2} On April 10, 2013, Miller was indicted on charges of attempted aggravated murder, attempted murder, felonious assault, and violating a protection order. The victim in this case is Miller's ex-wife, Rhoda Budin (f.k.a. Rhoda Miller). Miller entered a plea of no contest to the charge of violating a protection order, and he was found guilty of the remaining charges following a jury trial. The attempted aggravated murder, attempted murder, and felonious assault counts merged, and the trial court sentenced Miller to a prison term of eight years on Count 1, attempted aggravated murder, and six months on Count 4, violating a protection order, to run concurrently. The court also imposed a mandatory five years of postrelease control and ordered Miller to pay a $10,000 fine and costs.

{¶3} Miller appealed his conviction on the charges of attempted aggravated murder, attempted murder, and felonious assault. On February 12, 2015, this court reversed Miller's convictions, finding the trial court erred in admitting other acts evidence and the improper admission affected Miller's right to a fair trial. *See State v. Miller*, 2015-Ohio-519, 27 N.E.3d 564, ¶ 2 (8th Dist.). Additionally, we found that the trial

court erred when it allowed improper lay witness opinion testimony. *Id.* This court therefore vacated Miller's convictions and remanded for a new trial. *Id.*

{¶4} On remand, Miller elected to represent himself, and the court appointed stand-by counsel. The jury found Miller guilty on all counts. Once again, the counts were merged, and the state elected to have Miller sentenced on Count 2, attempted murder. The court sentenced Miller to eight years imprisonment.

{¶5} Miller now appeals his conviction and sentence, assigning the following errors for our review:

I. State misconduct during appellant's trial violated protections afforded by the Sixth and Fourteenth Amendments to the United States Constitution and require reversal.

II. The trial court erred when it admitted other acts testimony in violation of R.C. 2945.59, Evid.R. 404(B), and [appellant]'s rights under Article I, Section 16 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

III. The appellant was denied due process of law as the verdicts and judgment finding him guilty of attempted aggravated murder [in violation of] R.C. 2923.02/2903.01(A) and attempted murder [in violation of] R.C. 2923.02/2903.02(A) were based upon legally insufficient evidence.

IV. The sentence imposed by the court is contrary to law and must be vacated due to the failure of the court to consider the factors required by R.C. 2929.11 and R.C. 2929.12.

V. The [appellant] was denied due process of law and a fair trial as guaranteed by the United States Constitution due to the failure of the state to preserve valuable evidence.

Evidence at Trial

{¶6} Rhoda Budin was approximately 50 years old when she met Miller through a dating service. She worked as a medical secretary most of her adult life, and she had never been married. Miller worked as a pharmacist at the time. Ms. Budin stated that Miller had been married twice before and had two adult children with whom he no longer had a relationship.

{¶7} Ms. Budin described Miller as "scholastically very intelligent," and she believed he had a very high I.Q. She also stated that Miller enjoyed tinkering with cars, particularly with a Fiero that he owned. He had a Fiero car manual, and she would often see him "under the hood [of the Fiero] doing things."

{¶8} Miller and Ms. Budin married approximately one year after they met. Ms. Budin testified that they had a good relationship initially; however, their relationship changed shortly after the marriage. She stated that she witnessed changes in Miller's personality, he "wasn't very nice to [her]," and she began sleeping in the guest bedroom. He had mood swings, and she never knew if he would awake in a good mood or a bad mood. She tried to disregard his behavior because she "wanted it to work so badly." Ms. Budin explained that Miller would become angry and yell at her and she would not understand why. On one particular occasion, his anger turned into violence where he came home from work and "went into his office and just destroyed everything in his office * * *. It was thrown all over the floor everywhere, and it scared me."

{¶9} Ms. Budin further testified that her relationship with Miller was "[n]ot good," and by February 2013, it was "poor," and "[i]ncidents happened." Ms. Budin

explained that on one occasion, Miller "disappeared" and left her at a concert to find her own ride home, and on another occasion, he refused to leave the house with her and attend a holiday party; rather, he stayed home and went to bed. He also locked her out of their home once. They kept separate financial accounts, paid their own bills, lived in separate bedrooms, and engaged in "very little" marital relations. They discussed divorce, but it was not a discussion in "normal terms"; rather, Miller complained about how expensive divorce would be. Ms. Budin noted that Miller told her that she did not know "how expensive" a divorce would be or what it was like to go through a divorce. Miller had retired by this point in time and was no longer employed as a pharmacist. He lived on a small pension and had approximately $500,000 in savings.

{¶10} In the early afternoon on February 8, 2013, Ms. Budin was involved in an automobile accident. She was driving her 2004 Honda Civic in a shopping plaza while running errands, when her vehicle began to accelerate despite her foot being on the brake pedal. Ms. Budin testified that after stopping at a stop sign, she began to accelerate in order to make a right-hand turn. As she made her turn, the vehicle began to "accelerate by itself." She testified that while her foot was on the brake, "the car kept going and going and I couldn't stop." In order to avoid hurting anyone, Ms. Budin drove her car into a brick pillar, which was on a sidewalk in front of a nail salon. The car crashed into the pillar and completely shattered the window of the nail salon.

{¶11} After the accident, Ms. Budin called her husband, the defendant. She stated that he was home when she left the house around 10:30; however, she was not able

to immediately reach her husband. After several attempts, she was able to get through to him at home, and she told him that she was involved in an accident. Ms. Budin stated that they lived less than five minutes from the shopping plaza. However, it took Miller 20 minutes to reach the plaza, arriving after the police and fire department were on the scene. She stated that he "walked in" and merely looked at her. She expected Miller to embrace her and ask her if she was okay, but he did not do those things; rather, she "had to approach him." Ms. Budin testified that she was very shaken, but she did not feel that medical treatment was necessary at that time. The police instructed Ms. Budin to go home and wait for an officer to come to her home, because at this point, there was a concern about the building's stability. It was a "quiet" ride home, and upon arriving home, the two of them sat at opposite ends of a couch. Ms. Budin stated that there was little conversation between the two of them and Miller never asked her what happened.

{¶12} Jordan Silva is the operations manager for Peak Grounds Management Company. This company manages the landscaping and snowplowing at the shopping plaza where Ms. Budin's accident occurred. Silva testified that on February 8, 2013, the amount of snow required that he plow the parking lot of the shopping plaza twice that day. He further testified that while plowing for the second time that day, in the early afternoon, he witnessed a car in the plaza and then heard the shattering of glass. When he looked in the direction of the noise, he saw a car "had made its way through the [window of the] nail salon." He then phoned 911.

{¶13} Sergeant Todd Leisure and Officer Brian McCallister, of the Richmond Heights police department, responded to the scene. The officers observed Ms. Budin's vehicle on the sidewalk with bricks from the pillar on the hood of the vehicle, a broken pillar, and shattered glass. Sergeant Leisure testified that it appeared that some of the pillar landed on the hood as the vehicle made impact into the store front. The officers noted that customers were in the nail salon when they had arrived. Sergeant Leisure stated that due to the loss of the support column, he was concerned with the structural integrity of the building, and the businesses in the storefront were evacuated. Officer McCallister took photos of the scene.

{¶14} Sergeant Leisure testified that he twice attempted to remove the car from the storefront by backing it out into the parking lot. Each time, the engine began to accelerate quickly. The sergeant stated that he turned the key and "immediately the RPMs revved up. The vehicle accelerated to * * * real high RPMS. It's revving real bad. * * * It took off as if you would have the vehicle in park and someone [has] their foot on the gas pedal." He was startled and turned the ignition off. Sergeant Leisure confirmed that there was no debris on the floor board that would have interfered with the gas pedal before he attempted to start the engine for the second time. He got the same results the second time, turned the car off, and called a towing company.

{¶15} Allen Meyers, owner and operator of Ken's Auto Service for 48 years, arrived on the scene with a tow and conferred with the officers. After he pulled the car away from the building, Meyers opened the hood and immediately discovered a piece of

wood stuck in the throttle. He advised Officer McCallister to get a camera because the fact that wood was stuck, holding the throttle open, "wasn't normal." After discovering the piece of wood stuck in the throttle, Meyers was instructed to tow the vehicle to the Richmond Heights police garage. On cross-examination, Meyers testified that the wood appeared to be purposefully cut.

{¶16} When the vehicle arrived at the police station, Detective Sergeant Darren Porter observed the wooden "shim" lodged in the throttle. Thereafter, as part of the investigation, he instructed Officer McCallister to obtain further information about the vehicle from the Millers.

{¶17} Later the same day, Officer McCallister visited the Millers at their home. He reported what the officers had observed with respect to the wood shim, and he explained that the police department would be starting an investigation based upon the "suspicious circumstances." The following day, Officer McCallister returned to the Millers' home, where he collected various items from the garage, including wood chips and a shim. Miller provided Officer McCallister a bag of shims from the basement. Officer McCallister requested the Millers come to the police station in order to speak to them individually about the case.

{¶18} After they arrived at the police station, Office McCallister spoke with Miller in the interview room and advised Miller that he was conducting a preliminary investigation regarding his wife's accident. During the interview, Officer McCallister spoke with Miller regarding the suspicious nature of the accident and Miller's

relationship with his wife. The officer testified that Miller told him that he and his wife had a "love/hate relationship." Miller shared with the officer that there was a lot of tension in their relationship and his wife engaged in behavior that "aggravated" him. Officer McCallister also testified that, while at their home previously, Miller told the officer that he was mechanically inclined and Miller, in fact, "talked about the mechanics of the vehicle." During this conversation, Miller advised the officer that he once discovered a bagged lunch in the side panel of the car on which he had been working.

{¶19} Upon instruction from Sergeant Porter, Elmer Kastelic, a certified master auto technician and diagnostic technician with Motorcars Honda, examined Ms. Budin's vehicle. Sergeant Porter specifically requested that Kastelic examine the vehicle for any condition that might cause the vehicle to either accelerate on its own or, once it was accelerated, continue to accelerate after a foot was released from the accelerator. Upon examination, Kastelic found the vehicle to be in good working order. He specifically noted that there were no bindings, obstructions, or missing parts, and the operation of the throttle was normal.

{¶20} John Boyle, shop foreman dispatcher with Motorcars Honda, testified that an older couple came into the dealership in mid-February 2013, asking unusual questions. Boyle stated that the gentleman asked him if the hood of a car could be popped open without gaining access to the interior of the car. The gentleman inquired whether the hood could be popped open, left unattended for a period of time, and then "tampered with." Boyle told the couple that he needed more information in order to answer his

question. The gentleman finally informed Boyle that the car was a 2004 Honda Civic. Boyle then advised the gentleman that one could not open the hood to this particular vehicle without first gaining access to the interior of the vehicle. Boyle testified that the gentleman appeared upset with the answer and continued to ask him questions. When Boyle pursued further information, this gentleman told Boyle that he could not discuss the car because it was under police investigation.

{¶21} Approximately one month later, Boyle discovered a 2004 Honda Civic being towed into the shop where he works. Elmer Kastelic, the technician, informed Boyle that the police requested a full inspection of the vehicle. Recalling the conversation with the older couple one month earlier, Boyle relayed the details of this conversation to Sergeant Porter. After viewing pictures provided by the police department, Boyle identified the couple with whom he had spoken in February as Miller and Ms. Budin. Thereafter, he and Kastelic inspected the vehicle and found it to be in good working condition, with normal idling and no sudden acceleration issues.

{¶22} DNA evidence was recovered from the wood shim that was found wedged into the throttle of Ms. Budin's vehicle. Lindsey Nelsen-Rausch, forensic scientist with the Ohio Bureau of Criminal Investigation, testified that the DNA profile obtained from the wood shim was consistent with Miller's DNA.

{¶23} Sergeant Porter obtained a search warrant to search the Millers' home. In the course of conducting the search, Sergeant Porter discovered a voluminous automobile manual that provides instructions regarding auto mechanics. He also discovered a large

collection of tools, including those tools commonly used for working on cars. After the investigation was concluded, Miller was arrested and charged with attempted aggravated murder, attempted murder, and felonious assault.

{¶24} Sean Doyle, a mechanical engineer with SEA, a multi-disciplinary engineering fire investigation firm, testified as the state's expert witness. Doyle inspected Ms. Budin's vehicle for any defect or malfunction regarding the throttle mechanism and accelerator pedal mechanism. Doyle found no problems or defects with the throttle mechanism or the driver controls.

{¶25} Thereafter, Doyle re-created a wood shim to resemble the shim discovered by the police in Ms. Budin's vehicle. Upon inspection of the original shim that was discovered in the vehicle, Doyle noted that the shim had been altered, stating that the shim had been broken off approximately five inches from its thicker end, and a "C-shaped mouth" extended into the end of the shim. Doyle then placed the re-created shim around the throttle, as demonstrated by the photographs taken by the police department on the day of Ms. Budin's accident, and he examined the vehicle to determine what sort of behavior the wood shim would potentially elicit with respect to the actuation of the throttle.

{¶26} On three occasions, the wood shim "shift[ed]" and "wedge[d] itself such that it would hang the throttle open and the engine would be racing." Three times, the shim became wedged and held the throttle open. Each time, the throttle continued to race rather than idle. Doyle noted that the throttle could be normally operated through

small pedal inputs and the engine would return to idle without problems; however, a larger pedal input and subsequent pedal release could cause the shim to become "entrapped between the throttle lever and the cruise control cam," thus holding the throttle in a "stuck-throttle position." Doyle testified that this observed behavior was consistent with the reported incident of "the normally operating vehicle suddenly transitioning to a stuck-throttle position." Finally, Doyle testified that the shim would not have fallen, or migrated, from another location in the car because of the manner in which the shim was vertically wrapped around the lever on the throttle shaft.

## Prosecutorial Misconduct

**{¶27}** In his first assignment of error, Miller argues that his right to a fair trial was violated because of improper remarks made by the prosecutor in opening statements.

**{¶28}** In reviewing a claim of prosecutorial misconduct, we must determine whether the comments and questions by the prosecution were improper and, if so, whether they prejudiced appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883 (1984). An appellate court should only reverse a conviction if the effect of the misconduct "'permeates the entire atmosphere of the trial.'" *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, ¶ 99, quoting *State v. Tumbleson*, 105 Ohio App.3d 693, 699, 664 N.E.2d 1318 (12th Dist.1995). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

**{¶29}** Ordinarily, the prosecutor is entitled to considerable latitude in opening statements. *State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235, 910 N.E.2d 14, ¶ 44 (8th Dist.), citing *Maggio v. Cleveland*, 151 Ohio St. 136, 84 N.E.2d 912 (1949). Although not evidence, the opening statement is intended to advise the jury what counsel expects the evidence to show and what reasonable inferences may be drawn from the evidence. *Clay* at ¶ 43. The prosecutor may therefore make statements, in good faith, as to what he or she expects the evidence will show. *Clay* at ¶ 45, citing *State v. Patterson*, 5th Dist. Stark No. 2005CA00078, 2005-Ohio-6703, ¶ 162. Prosecutors may not, however, make "insinuations and assertions calculated to mislead," express their personal beliefs or opinions regarding the guilt of the accused, or allude to matters not supported by admissible evidence. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990).

**{¶30}** Where, as here, the defense fails to object to alleged prosecutorial misconduct, he or she waives all but plain error. *State v. Bell*, 8th Dist. Cuyahoga No. 102141, 2015-Ohio-4178, ¶ 50. Plain error exists only if the outcome of the trial clearly would have been otherwise, but for the error. *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 61. The alleged misconduct constitutes plain error "only if it is clear that [the defendant] would not have been convicted in the absence of the improper comments." *Bell*, citing *State v. Slagle*, 65 Ohio St.3d 597, 606, 605 N.E.2d 916 (1992). Notice of plain error is to be taken with the utmost caution, under

exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978).

**{¶31}** In support of his argument, Miller alleges that the following passage was improper:

> As you heard yesterday, Ronald Miller is the smartest man in the room. He's smarter than each and every one of you put together. He's smarter than me, he's smarter than everyone. * * * But Ronald Miller isn't this friendly little old man that you see. Ronald Miller was on his third wife. Ronald Miller has two children he has no relationship with. * * * But we're dealing with the smartest man in the room here, and I submit you're dealing with a wolf in sheep's clothing.

**{¶32}** Miller contends that the foregoing comment referred to matters that would not be in evidence, it constituted an improper attack on his character, and it was made in mockery of Miller. We disagree.

**{¶33}** The alleged improper comment noted by Miller is taken out of context. When taken in context with the prosecutor's entire comment, however, we find the comment was a good-faith statement as to what the prosecutor expected the evidence would show, and the comment was, in fact, supported by the evidence. The prosecutor stated, in total, as follows:

> As you heard yesterday, Ronald Miller is the smartest man in the room. He's smarter than each and every one of you put together. He's smarter than me, he's smarter than everyone. Ronald Miller had a successful career as a pharmacist. He has an extremely high IQ. In his spare time, he liked to tinker with cars. He was in a Fiero club. But Ronald Miller

also isn't this friendly little old man that you see.  Ronald Miller was on his third wife.   Ronald Miller has two children he has no relationship with.

 And you're going to hear testimony from Ronald Miller's ex-wife * * *. You're going to hear from [Ms. Budin].   How they met. * * *  Two of them, they lived in separate bedrooms, had separate lives, and frankly, you'll hear from her, she nags quite a bit, she whines quite a bit, and it drove him crazy.

{¶34} Additionally, when the prosecutor referred to "a wolf in sheep's clothing," he stated:

> What do we have? Right now, we've got a wood shim stuck in the car. The DNA is down the road.   Testing takes a little while.   So the police are left to why is there a shim in this * * * car?   What do they do?   They go interview [Ms. Budin] and Mr. Miller.   What does Mr. Miller say?

Now, ladies and gentlemen, again, you don't have to talk to the police. But we're dealing with the smartest man in the room here, and I submit to you you're dealing with a wolf in sheep's clothing.   He tells police I don't know why there's a wood shim in there.   I've seen things in cars all the time.   In fact, one time I found a sandwich in a Volkswagen in the '70's. Never mentions the shim.   So we're following up.   Police keep their investigation going and going.

{¶35} During trial, Ms. Budin testified concerning her relationship with Miller. She stated that when they first married, their relationship was good, but it changed shortly thereafter, becoming "poor."   He was no longer nice to her, they began sleeping in

separate bedrooms, they kept separate finances, he had mood swings, he became angry and violent, and he frightened her. Ms. Budin testified that when she attempted to discuss divorce, Miller complained about the cost of divorce and that she did not know what it was like to go through a divorce. She explained that Miller had been married twice before and had two adult children with whom he no longer had a relationship. Ms. Budin also testified that Miller was a pharmacist when they married, he was "scholastically very smart," he had a very high IQ, and he liked to tinker with cars.

{¶36} Additionally, Officer McCallister testified that Miller told him that he and his wife had a "love/hate relationship" and that his wife often aggravated him. The officer also testified that Miller told him he was mechanically inclined and liked to work on cars and, in fact, he had once discovered a lunch in the side panel of a car on which he was working.

{¶37} Considering the prosecutor's comment in its entirety, and in the context of the entire trial, we find nothing improper. A prosecutor's isolated comments are not to be taken out of context and "given their most damaging meaning." *State v. Williams*, 8th Dist. Cuyahoga No. 97039, 2012-Ohio-1741, ¶ 12, citing *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996). Courts must review the remark within the context of the entire trial. *Id.* Here, the prosecutor's foregoing comment was properly based on the evidence and it suggested reasonable inferences from which the jury could draw. Such reasonable inference includes, as the state suggests, that Miller is not the man he at first appears to be.

**{¶38}** Miller also contends that the prosecutor improperly injected his opinion when he stated, "But how do I know Ronald Miller did this? Could have just been a wood shim from anywhere, right? Ronald Miller did not think ahead because inspecting an accident, your evidence is destroyed, it's on fire, it's on the ground, it's just a car accident." This statement, however, preceded the prosecutor's explanation of what he expected the evidence to show, stating, "[b]ecause this happened at a slow miles per hour rate, this shim still lodged in and there's one little thing that links him there. DNA * * *. Ronald Miller didn't use gloves and his DNA was still on the wood shim." The state did, in fact, present DNA evidence and expert testimony concerning the vehicle's operation with the wood shim in its throttle.

**{¶39}** While the prosecutor's comment undoubtedly included his opinion regarding Miller's guilt, it was an isolated comment that was based upon the evidence presented at trial. The general rule is that "'where personal opinions of guilt are predicated upon the evidence, though frowned upon, they are not deemed to be prejudicially erroneous.'" *State v. Reynolds*, 80 Ohio St.3d 670, 681, 687 N.E.2d 1358 (1998), citing *Stephens*, 24 Ohio St.2d at 83, 263 N.E.2d 773 (comparing opinions based upon facts in evidence as opposed to opinions based upon facts outside the evidence). Here, where the prosecutor followed his comment with an outline of the evidence the jury would hear, his remark did not constitute prosecutorial misconduct.

**{¶40}** Finally, Miller contends that the prosecutor's statement concerning the state's theory of motive was based on "his own imagination" and was therefore improper.

Specifically, Miller objects to the prosecutor's comment that "Mr. Miller wouldn't have since gone through his third divorce and lost all of his money. Because that's all it is. Just didn't want to go through a divorce and have money again. Didn't work out that way."

{¶41} Here, the state advanced the theory that Miller's motive for murder was that Ms. Budin was considering divorce and Miller did not want a divorce because of the financial strain. As previously discussed, Ms. Budin testified that her relationship with Miller had become "poor." She explained that Miller's behavior changed after marriage, he became angry and violent, and he frightened her. When she attempted to discuss divorce, he refused, telling her "how expensive" a divorce would be and that she "[didn't] know what [divorce] was like." Ms. Budin testified that Miller had been married two previous times. She also testified that at the time of the accident, Miller had been retired and was living on a small pension and some savings. The prosecutor's comments were therefore supported by facts in evidence from which the jury could make reasonable inferences as to Miller's motivation for his actions.

{¶42} Even assuming the prosecutor's comments as noted above were improper, we cannot say that these comments deprived Miller of a fair trial. Considering the remarks in the context of the entire trial, as we are required to do, we do not find that such comments permeated the atmosphere of the entire trial such that Miller had been denied a fair trial. And other than the general assertion that the prosecutor's remarks prejudiced

him, Miller fails to demonstrate how the outcome of the trial would have been different had the prosecutor not made such comments.

**{¶43}** Moreover, the court specifically instructed the jury as follows: (1) neither the opening statements by the parties, their remarks during the course of the trial, nor their arguments made at the conclusion of the taking of the evidence are to be considered by you as evidence in this case; (2) statements and arguments of the parties are for the purpose of aiding you in your analysis of the evidence and to give you the benefit of such deductions and reasonable inferences made by the parties as may logically appeal to your wisdom and judgment; and (3) proof of a motive is not required. The jury is presumed to follow the instructions of the trial court. *State v. Hostacky*, 8th Dist. Cuyahoga No. 100003, 2014-Ohio-2975, ¶ 48, citing *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), paragraph four of the syllabus. We have no basis to conclude that the jury failed to do so.

**{¶44}** Accordingly, we find that the prosecutor's alleged improper comments do not constitute plain error that would necessitate a new trial. Miller's first assignment of error is overruled.

Other Acts Evidence

**{¶45}** In his second assignment of error, Miller contends that the trial court erred when it allowed the testimony of his ex-wife, in which she testified regarding Miller's relationship with his children and two alleged incidents in their marriage. Miller argues that the evidence was offered solely to prove that he is a person with bad character who likely acted in conformity with his prior bad acts. The state submits that the testimony was properly admitted in order to demonstrate Miller's motive.

**{¶46}** Evid.R. 404(B), "other acts," provides that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Such evidence may, however, be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

**{¶47}** Similarly, R.C. 2945.59, which provides certain exceptions to the common law regarding the admission of evidence of other acts of wrongdoing, provides that

[i]n any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

*State v. Terry*, 2014-Ohio-4804, 23 N.E.3d 188, ¶ 64 (8th Dist.).

**{¶48}** In determining whether other-acts evidence is to be admitted, trial courts conduct a three-step analysis: (1) determine if the other-acts evidence is relevant under Evid.R. 401; (2) consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith, or whether the other-acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B); and (3) consider whether the probative value of the other-acts evidence is substantially outweighed by the danger of unfair prejudice. *State v. Jamie*, 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3583, ¶ 32, citing *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20.

**{¶49}** The admission of other acts evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb such evidentiary decisions in the absence of an abuse of discretion that created material prejudice. *State v. Diar*, 120

Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66.  Where, however, defendant fails to object to the alleged improper other acts testimony, he waives all but plain error. *State v. Almazan*, 8th Dist. Cuyahoga No. 103563, 2016-Ohio-5408, ¶ 36.

**{¶50}** In order to find plain error, a reviewing court must find there is an error; the error is "an 'obvious' defect in the trial"; and "the error must have affected [the defendant's] 'substantial rights.'"  *Id.* at ¶ 37, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).  A defendant's substantial rights are affected if the outcome of the trial would have been different, but for the error.  *Almazan.*  Notice of plain error will be taken only under exceptional circumstances and to prevent a miscarriage of justice.  *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus.

**{¶51}** Here, Ms. Budin testified, without objection, that Miller has no relationship with his two children from a previous marriage.  Miller contends that this evidence was presented in order to prove that he is a bad father because he has no relationship with his grown children.

**{¶52}** Miller, however, has failed to demonstrate that this testimony constituted plain error.  The record shows that this evidence was obtained in relation to Ms. Budin's relationship with Miller and Miller's previous marriages.  The prosecutor asked Ms. Budin if Miller had been married previously and if he had any children.  Ms. Budin stated that Miller had been married twice before and he had two children from a previous marriage.  When the prosecutor asked Ms. Budin if she was aware if Miller had a

relationship with his two children, she replied that he did not. The prosecutor then continued to ask Ms. Budin about her marriage to Miller. The prosecutor did not attempt to further develop any testimony concerning Miller's children, the reason he did not see his children, or what kind of a father Miller was. While Miller's relationship with his adult children is arguably irrelevant to his relationship to Ms. Budin, we cannot say the admission of such testimony is an obvious defect in the trial that affected Miller's substantial rights. Miller has not demonstrated that but for this testimony, the outcome of his trial would have been different.

{¶53} Ms. Budin also testified regarding two incidents that occurred during their marriage. Regarding the first incident, Ms. Budin testified that Miller, upon arriving home from work one evening, "destroyed everything in his office." She also testified that Miller locked her out of their home once, and on one occasion, he "disappeared" without explanation and left her at a concert, forcing her to find her own ride home. Miller objected to this testimony as irrelevant. The trial court overruled Miller's objection, finding the testimony was relevant "to establish the relevant background to the status of the relationship in this case."

{¶54} Here, the state's theory of Miller's motive for his crimes was that Miller did not want to go through another costly divorce. In order to establish this motive, the state must establish why Ms. Budin was unhappy in her marriage and wished to discuss divorce. In her testimony, Ms. Budin testified that although her marriage started out well, it deteriorated shortly thereafter. She explained that Miller was no longer nice to

her, he had mood swings, and he became angry with her. She testified that Miller's anger escalated into violence. Ms. Budin described other instances in their relationship that upset her, including when Miller locked her out of her home and when he left her at a concert. She testified that they slept in different bedrooms and maintained separate finances. Ms. Budin also testified that she was aware that Miller had been married twice before; however, he did not wish to discuss divorce with her because it was too expensive and she did not know what it was like to go through a divorce.

{¶55} We find that Ms. Budin's testimony was relevant to establishing the background of Ms. Budin's relationship with Miller and was offered to prove Miller's motive in committing the crimes, as permitted under Evid.R. 404(B).

{¶56} Given the evidence presented at trial, including Miller's automotive knowledge, the testimony from the Motorcars mechanic regarding his conversation with Miller concerning the ability to tamper with a car, the expert's testimony that the wood shim was purposefully cut and could not have fallen and wedged itself around the throttle, the wood shims discovered at Miller's home, and Miller's DNA on the wood shim discovered in the car, we do not find the danger of unfair prejudice substantially outweighed the probative value of the testimony. Therefore, we cannot say the trial court abused its discretion in allowing the foregoing testimony.

{¶57} Miller's second assignment of error is overruled.

Sufficient Evidence

**{¶58}** In his third assignment of error, Miller contends that the state failed to present sufficient evidence to sustain his convictions for attempted aggravated murder and attempted murder. Specifically, he argues that the state failed to demonstrate that he intended to cause the death of the victim.

**{¶59}** When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

**{¶60}** The state may use direct evidence, circumstantial evidence, or both, in order to establish the elements of a crime. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Circumstantial evidence is "proof of facts or circumstances by direct evidence from which the trier of fact may reasonably infer other related or connected facts that naturally or logically follow." *State v. Seals*, 8th Dist. Cuyahoga No. 101081, 2015-Ohio-517, ¶ 32, citing *State v. Beynum*, 8th Dist. Cuyahoga No. 69206, 1996 Ohio

App. LEXIS 2143 (May 23, 1996); *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37.

**{¶61}** Circumstantial evidence and direct evidence inherently possess the same probative value. *Jenks* at paragraph one of the syllabus. "[A]ll that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Id.* at 272. "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, ¶ 9, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). And circumstantial evidence alone is sufficient to support a conviction. *State v. Coleman*, 8th Dist. Cuyahoga No. 102966, 2016-Ohio-297, ¶ 22.

**{¶62}** Miller was convicted of attempted murder, in violation of R.C. 2923.02 and 2903.02(A), and attempted aggravated murder, in violation of R.C. 2923.02 and 2903.01(A). Pursuant to the statute governing murder, no person shall "purposely cause the death of another * * *." R.C. 2903.02(A). In accordance with the statute governing aggravated murder, no person "shall purposely, and with prior calculation and design, cause the death of another * * *." R.C. 2903.01(A). "Attempt" is set forth as follows: "No person, purposely * * * shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A).

**{¶63}** A person acts purposely when it is his "specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature,

regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Purpose," therefore, depends on an intended result. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 72.

{¶64} Circumstantial evidence can be used to demonstrate purpose or intent. *State v. Martin*, 8th Dist. Cuyahoga No. 91276, 2009-Ohio-3282, ¶ 23. Whether an offender had the specific intent to kill is a determination made upon the facts and circumstances surrounding the crime. *State v. Barrow*, 8th Dist. Cuyahoga No. 101356, 2015-Ohio-525, ¶ 16. Such factors to be considered include the nature of the instrument used, the lethality of the instrument, and the manner in which the wound was inflicted. *Id.*, citing *State v. Majid*, 8th Dist. Cuyahoga No. 96855, 2012-Ohio-1192, ¶ 23. "A jury may infer a defendant's purpose to cause death when the defendant inflicts a wound with a deadly weapon in a manner that appears to be calculated to destroy life or inflict great bodily harm." *State v. Shorter*, 7th Dist. Mahoning No. 11 MA 42, 2012-Ohio-2701, ¶ 16, citing *State v. Stallings*, 89 Ohio St.3d 208, 291, 731 N.E.2d 159 (2000). It is well settled that an automobile can be classified as a deadly weapon when it is used "in a manner likely to produce death." *State v. Andre*, 8th Dist. Cuyahoga No. 101023, 2015-Ohio-17, ¶ 37; *State v. Sternbach*, 8th Dist. Cuyahoga No. 100653, 2014-Ohio-4203, ¶ 24; *State v. Tate*, 8th Dist. Cuyahoga No. 87008, 2006-Ohio-3722, ¶ 23; *see also* R.C. 2923.11.

{¶65} Here, we find that a rational trier of fact could find, through both direct and circumstantial evidence, that Miller intended to cause Ms. Budin's death. The evidence showed that the relationship between Miller and Budin was strained. Miller told the investigating police officer that he had a "love/hate" relationship with his wife and that she "aggravated" him. For all intents and purposes, they lived separate lives, sleeping in separate bedrooms and maintaining separate finances. Ms. Budin attempted to discuss divorce, but Miller refused, stating that divorce is too costly.

{¶66} The evidence further showed that Miller used his intellect and his knowledge of automobiles to tamper with Ms. Budin's vehicle. As we have stated, an intent to kill can be inferred when a deadly weapon is used. *Shorter* at ¶ 16. And a vehicle can be a deadly weapon when used in a manner likely to produce death or great bodily harm. *Andre* at ¶ 37.

{¶67} The testimony established that when Ms. Budin attempted to make a right-hand turn, the car began to accelerate by itself and continued to accelerate, despite applying the brakes. As a result of this acceleration, Ms. Budin crashed into a brick pillar, shattering the storefront window, and causing the building to be deemed structurally unsafe. When a police officer started the ignition and attempted to remove the car from the storefront, the engine revved up to an extremely high speed and the officer was unable to safely remove the car. The testimony also established that only a larger pedal input would cause the wood shim to become wedged around the throttle and, thus, hold the throttle open.

**{¶68}** Under these circumstances, it is reasonable for a jury to conclude that where a car has been tampered with in such a manner, serious injury or death is a likely result. "'A person using * * * deadly and destructive objects is held, under the law, to intend the natural and probable consequences resulting from the manner in which such objects were used.'" *State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 113, quoting *State v. Butler*, 11 Ohio St.2d 23, 34, 227 N.E.2d 627 (1967).

**{¶69}** In light of the foregoing, we find that any rational trier of fact could have found the essential elements of attempted aggravated murder and attempted murder proven beyond a reasonable doubt when considering the evidence in a light most favorable to the state. Miller's third assignment of error is therefore overruled.

Sentence

**{¶70}** In his fourth assignment of error, Miller contends that his sentence is contrary to law because the court failed to consider the sentencing factors outlined in R.C. 2929.11 and 2929.12 in fashioning his sentence. In support, Miller argues that the court "focused on" the sentence imposed following the first trial.

**{¶71}** A sentence is not clearly and convincingly contrary to law "where the trial court considers the purposes and principles of sentencing under R.C. 2929.11 as well as the seriousness and recidivism factors listed in R.C. 2929.12, properly applies postrelease control, and sentences a defendant within the permissible statutory range." *State v. A.H.*, 8th Dist. Cuyahoga No. 98622, 2013-Ohio-2525, ¶ 10, citing *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 18.

**{¶72}** R.C. 2929.11(A) provides that those purposes "are to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." The factors under R.C. 2929.12(A) include the seriousness of the offender's conduct, the likelihood of recidivism, and "any other factors that are relevant to achieving those purposes and principles of sentencing." Among these sentencing factors, the court must consider the "more serious" factors, such as "[t]he victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense." R.C. 2929.12(B)(2). Additionally, the court must consider any mitigating factors listed in R.C. 2929.12(C)-(F).

**{¶73}** Although the trial court has a mandatory duty to "consider" the statutory factors under R.C. 2929.11 and 2929.12, the court is not required to engage in any factual findings under R.C. 2929.11 or 2929.12. *State v. Combs*, 8th Dist. Cuyahoga No. 99852, 2014-Ohio-497, ¶ 52; *State v. Bement*, 8th Dist. Cuyahoga No. 99914, 2013-Ohio-5437, ¶ 17. "While trial courts must carefully consider the statutes that apply to every felony case, it is not necessary for the trial court to articulate its consideration of each individual factor as long as it is evident from the record that the principles of sentencing were considered." *State v. Gonzalez*, 8th Dist. Cuyahoga No. 102579, 2015-Ohio-4765, ¶ 6, citing *State v. Roberts*, 8th Dist. Cuyahoga No. 89236, 2008-Ohio-1942, ¶ 10. This court has held that a trial court's statement in its sentencing

entry that it considered the required statutory factors, without more, is sufficient to fulfill a sentencing court's obligations under R.C. 2929.11 and 2929.12. *Gonzalez* at ¶ 7.

{¶74} Here, although the court referenced the sentence Miller received on the first trial, our review of the record demonstrates that the trial court considered R.C. 2929.11 and 2929.12 before sentencing Miller in his second trial. Prior to imposing sentence, the court heard from the prosecutor, who addressed Miller's "complete disregard for human safety" and how the victim's car "took out an entire building." He stated that Miller is a danger to the community. The court also heard from the victim, who explained that her marriage to Miller was based upon lies, and Miller betrayed her trust. She further stated that she is living "one continuous nightmare * * *, having to relive that horrible day over and over again" and she is emotionally and psychologically scarred. The court also heard from Sergeant Porter, who noted Miller's failure to take responsibility for his actions. Finally, the court heard from Miller, who asked the court to consider his advanced age and physical condition.

{¶75} In addressing Miller, the court noted Miller's arrogance and his lack of remorse. Thereafter, prior to imposing an eight-year sentence, the court stated that it considered the purposes and principles of felony sentencing. The court also reiterated in its sentencing entry that it considered "all required factors of the law."

{¶76} In light of the foregoing, it is evident from the record that the trial court considered the purposes and principles of sentencing and all relevant sentencing factors

prior to the imposition of sentence. Miller's sentence is therefore not clearly and convincingly contrary to law.

## Preservation of Evidence

**{¶77}** In his final assignment of error, Miller contends that he was denied due process of law due to the state's disposal of the vehicle driven by his wife on the date in question.

**{¶78}** On June 25, 2015, Miller filed a "motion for production of vehicle in question." In his motion, Miller requested that he have access to the vehicle in order to prepare his defense. He alleged that the state's failure to produce the vehicle "[would] impair the defendant's ability to effectively defend himself." At a hearing on the motion, Miller explained that he wanted to subject the vehicle to inspection by his own experts and he wished to have a jury view of the engine. On appeal, Miller claims that he was denied due process in being denied access to the instrumentality of the crime "merely because the state did not feel like bothering to locate it."

**{¶79}** A defendant's due process rights are violated if the prosecution fails to preserve materially exculpatory evidence. *State v. Simmons*, 8th Dist. Cuyahoga No. 96208, 2011-Ohio-6074, ¶ 9, citing *State v. Lewis*, 70 Ohio App.3d 624, 634, 591 N.E.2d 854 (4th Dist.1990). Evidence is materially exculpatory if "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Simmons*, quoting *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1989), paragraph five of the syllabus. A "reasonable

probability" is a probability sufficient to undermine confidence in the outcome. *State v. Sowell*, 8th Dist. Cuyahoga No. 90732, 2008-Ohio-5875, ¶ 26.

{¶80} This court has previously held that the possibility that evidentiary material could have exculpated the defendant if preserved or tested is not enough to satisfy the standard of constitutional materiality. *State v. Durham*, 8th Dist. Cuyahoga No. 92681, 2010-Ohio-1416, ¶ 12, citing *Arizona v. Youngblood*, 488 U.S. 51, 56, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In drawing a distinction between "materially exculpatory" and "potentially useful," the Ohio Supreme Court has determined that "if evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *State v. Geeslin*, 116 Ohio St.3d 252, 254, 2007-Ohio-5239, 878 N.E.2d 1. Thus, when evidence is only potentially useful, its destruction does not violate due process unless the police acted in bad faith when destroying the evidence. *Simmons*, citing *Youngblood* at 58; *State v. Miller*, 161 Ohio App.3d 145, 2005-Ohio-2516, 829 N.E.2d 751 (2d Dist.).

{¶81} The term "bad faith" generally implies something more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive, or ill will partaking of the nature of the fraud. It also embraces actual intent to mislead or deceive another. *Durham* at ¶ 13, citing *State v. Smith*, 2d Dist. Montgomery No. 20247, 2005-Ohio-1374, ¶ 7.

**{¶82}** The defendant bears the burden of demonstrating the exculpatory nature of the unavailable evidence. *Sowell*, 8th Dist. Cuyahoga No. 90732, 2008-Ohio-5875, at ¶28.

**{¶83}** Here, Miller essentially alleges that the production of the Honda Civic would only have been potentially useful, and he does not assert how the vehicle was materially exculpatory, or how its production would have changed the outcome of his trial. Miller asserts, however, that denying him access to the vehicle, following a reasonable request, "would seem inconsistent with due process," where the state simply "did not feel like bothering to locate" the vehicle. Appellant's brief at 22-23. We find no merit to his argument.

**{¶84}** The state acknowledged that Ms. Budin's Honda Civic was no longer available at the time of trial. However, the state provided that numerous photographs of the vehicle were taken. Officer McCallister took photographs of the vehicle at the scene, both before and after discovery of the wood shim (state's exhibit Nos. 2A-R). The state's expert, Sean Doyle, also inspected the vehicle and took numerous photographs during his inspection (state's exhibit Nos. 14A-Z). Moreover, Sergeant Porter testified that, although the vehicle was not available at trial, it was stored in the police garage for more than nine months and was obtained for a prior hearing during this time.

**{¶85}** Additionally, Sergeant Porter explained that he mistakenly released the vehicle. He stated that, believing he no longer needed the vehicle, and Ms. Budin did, in fact, need her vehicle, he released it to Ms. Budin. And on March 13, 2013, title was

transferred from Ms. Budin to her insurance company. Thereafter, the vehicle was sold at auction as a salvaged vehicle.

{¶86} Sergeant Porter then explained his efforts in attempting to retrieve the vehicle after it was sold at auction, upon learning of his mistake. He learned from the auction company that the vehicle was being repaired at a body shop in Cleveland. Sergeant Porter contacted the body shop and, consequently, the new owner of the vehicle. Sergeant Porter informed the new owner that the car was mistakenly released, and he asked for permission to retain the vehicle in the event his department may need it in the future. The new owner agreed, knowing the vehicle would be returned to him in a matter of months. Sergeant Porter then obtained the vehicle and stored it in a secure garage, where it remained for approximately nine months. Sergeant Porter noted that during this time, the vehicle was also towed in for a viewing at a prior hearing. After the hearing, the vehicle was transported back to the police garage, and approximately two months later, it was returned to the new owner.

{¶87} In light of the foregoing, we cannot find that Miller's due process rights were violated. Miller does not allege, let alone demonstrate, how the result of his trial would have been different had the Honda Civic been available to him. Furthermore, we find no evidence of bad faith. The record is devoid of any evidence, or allegation, that the state engaged in any "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive" when it released the vehicle. *Durham*, 8th Dist. Cuyahoga No. 92681, 2010-Ohio-1416, at ¶ 13. Miller's assertion

that the state "did not feel like bothering to locate" the vehicle does not rise to the level of bad faith, nor is it supported by the record.

**{¶88}** Miller's final assignment of error is overruled.

**{¶89}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
TIM McCORMACK, JUDGE

LARRY A. JONES, SR., A.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR